**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| In re:<br><br>**B.A.S.S. & M., INC., *ET AL.*,**<br><br>Debtors. | Hon. Daniel R. Fine<br><br>Case No. 24-bk-15381<br>Chapter 7<br>Jointly Administered |
| **CITY OF CHICAGO,** NOT INDIVIDUALLY, BUT DERIVATIVELY FOR THE BANKRUPTCY ESTATES OF B.A.S.S. & M., INC., Dover I, LLC, Dagny, LLC, Daisyland, LLC, Darcy, LLC, Darden, LLC, Debrox, LLC, Derby, LLC, Dion, LLC, Direct, LLC, Distinctive, LLC, Dorchester, LLC, MGIL LLC, Real Soil, LLC, Real Taxes, LLC, Regal, LLC, S.T.E.P.A., Inc., STTA LLC, Super I, LLC, Vital LLC, and Vivid LLC,<br><br>Plaintiff,<br><br>v.<br><br>**SUZIE BABA WILSON, SWEDLANA DASS, DISCOUNT INN, INC., RANDOM CORP., SNS GENERAL CORP., VINCENNES CORP., BEAM OF CANAAN, LLC, CLARK LLC, COMMA CORP., COMMON I, LLC, DULCE, LLC, FCOC, LLC, LOT ACQUISITION, LLC, MNM REALTY, INC., NRH, LLC, NSW ASSETS, LLC, NSW PROPERTIES, LLC, PULSE PATH, LLC, REAL BUILDING, LLC, ROVO, LLC, S & M DEVELOPMENT I CORP., SIMPLE SOLO, LLC, SOLO LAND CORP., TAX PROPERTY INVESTMENT FUND, LLC, TURNER PROPERTIES, INC., VICTORIOUS, LLC, 4311 WEST PALMER, INC., 10635 S WENTWORTH LLC;** | Adv. Pro. No. ______________ |

**CHICAGO TITLE LAND TRUST CO., AS TRUSTEE UNDER A TRUST AGREEMENT DATED APRIL 15, 2025 AND KNOWN AS TRUST NUMBER 9002348628, CHICAGO TITLE LAND TRUST CO., AS TRUSTEE UNDER A TRUST AGREEMENT DATED APRIL 6, 2026 AND KNOWN AS TRUST NUMBER 9002350979, CHICAGO TITLE LAND TRUST CO., AS TRUSTEE UNDER A TRUST AGREEMENT DATED APRIL 6, 2026, AND KNOWN AS TRUST NUMBER 9002350981, CHICAGO TITLE LAND TRUST CO., AS TRUSTEE UNDER A TRUST AGREEMENT DATED APRIL 6, 2026 AND KNOWN AS TRUST NUMBER 9002351104; CHICAGO TITLE LAND TRUST CO., AS TRUSTEE UNDER A TRUST AGREEMENT DATED APRIL 6, 2026 AND KNOWN AS TRUST NUMBER 9002351106,**

Defendants.

**COMPLAINT**

*"Lana and I are the Debtors…"*

- Suzie Baba Wilson, February 2, 2025.

# TABLE OF CONTENTS

I. Nature of the Case ........ 1
II. Jurisdiction and Venue ........ 2
III. Parties ........ 3
A. The Plaintiff. ........ 3
B. The Individual Defendants. ........ 3
C. The Enterprise Defendants (and Debtors). ........ 4
1. The “Primary Entities” ........ 4
2. The “Secondary Entities” ........ 9
3. The “Affiliate Entities” ........ 10
4. The “SD Manager Entities” ........ 12
5. The “Children Entities” ........ 13
6. The “Litigation-Timed Trusts” ........ 15
IV. Facts Common to All Counts ........ 16
A. Enterprise Overview. ........ 16
B. Enterprise Timeline. ........ 18
1. Enterprise Creation (1991 — 2007) ........ 18
2. Sorting the Enterprise Entities to Shield Assets (2007 — 2023) ........ 21
3. Concealing Control and Further Asset Transfers (2023 — 2024). ........ 30
4. Enterprise Continues Unabated Postpetition (2024 — present) ........ 35
C. The Sisters ARE the Enterprise. ........ 39
1. Enterprise Entities Failed to Observe Even Basic Legal Formalities. ........ 40
2. Inter-Enterprise “Loans” are a Sham. ........ 43
3. Across the Entire Enterprise the Sisters Funneled All Funds to Themselves ........ 46
4. The Sisters also drained the Debtors’ bank accounts directly, account by account. ........ 48
5. Wilson and Dass collected the Debtors’ rental income personally, so the Debtors’ income never even went into their accounts. ........ 50

6. The Sisters moved money freely among the Enterprise's entities whenever it suited them, without regard to which entity "owned" the funds. .................. 53
7. The Sisters' own accountants moved income on paper between the entities to manage the Sisters' personal tax exposure. .................................................. 54
8. Even the Sisters Got Confused. .................................................................. 56

V. Counts for Relief .......................................................................................... 56
COUNT I Alter Ego and Piercing the Corporate Veils.......................................... 57
COUNT II Substantive Consolidation of the Non-Debtor Defendants.................. 64
COUNT III Substantive Consolidation of the Debtors' Estates............................ 66
COUNT IV Avoidance of Transfers Under Illinois Law — Constructive Intent.. 68
COUNT V Avoidance of Transfers Under Illinois Law — Actual Intent ............. 72
COUNT VI Avoidance of Transfers — Constructive Intent................................... 78
COUNT VII Avoidance of Transfers — Actual Intent........................................... 80
COUNT VIII Avoidance of Post-Petition Transfers............................................... 83
COUNT IX Breach of Fiduciary Duty .................................................................... 85

VI. Exhibits.

Exhibit A – Enterprise Organization Chart / Structure
Exhibit B – Timeline of Entity Creation (B1 – Spreadsheet) (B2 – Graphical)
Exhibit C – Email dated Nov. 4, 2024
Exhibit D – Email dated Sept. 16, 2024
Exhibit E – Email dated Feb. 2, 2025
Exhibit F – Transfers Spreadsheets
Exhibit G – Rent Payment Spreadsheets

## I. NATURE OF THE CASE

1. For more than 35 years, Suzie Baba Wilson and her sister, Swedlana Dass, have run one of the largest tax-sale real estate operations in Chicagoland and beyond. Buying distressed properties by the hundreds, they built an enterprise that has generated tens of millions of dollars in sale proceeds and millions more in rent, while paying almost nothing in the millions in municipal fines the enterprise incurred. This case is not about whether that land speculation is a sound business, or whether any given property was a good investment. It is about how that enterprise is run — whether the more than 40 entities Wilson and Dass created operate as real entities or merely as shell companies existing on paper but nothing more than their sham instrumentalities in practice. The facts clearly show the latter and not the former. Worse still, the enterprise — complete with fraudulent transfers and concealed assets — continues today.

2. This Complaint asks the Court for three general types of relief. First, disregard the corporate fictions Wilson and Dass built to insulate themselves from the duties and debts of their enterprise. The Debtors, the Defendant entities, and Wilson and Dass personally have never operated as anything other than a single entity; equity requires treating them for what they are. Second, avoid and recover the specific transfers by which Wilson and Dass stripped the Debtors of the money and property that should have gone to their creditors. Third, hold Wilson and Dass liable for breaching their fiduciary duties to the Debtors and creditors.

3. These allegations are not speculative. They come from the Debtors' own bank

records, the Debtors' own bankruptcy schedules, sworn testimony given by Wilson at the meeting of creditors, contemporaneous emails written by Wilson and Dass, and admissions made in writing by the Debtors' own accountants.

## II. JURISDICTION AND VENUE

4. This adversary proceeding arises in the Debtors'[1] Chapter 7 bankruptcy cases, now jointly administered and pending before the Court as case number 24-bk-15381.

5. The Court has jurisdiction to hear and determine this adversary proceeding pursuant to 28 U.S.C. § 157(a) and Local Rule 40.3.1(a) of the United States District Court for the Northern District of Illinois.

6. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

7. In the event any portion of this proceeding is a non-core proceeding, the City consents to the entry of a final order by the bankruptcy court pursuant to 28 U.S.C. § 157(c)(2).

8. The Court is the proper venue for this proceeding pursuant to 28 U.S.C. § 1409(a).

[1] The jointly administered Debtors are: B.A.S.S. & M., Inc. (24-15381), Dover I, LLC, (24-15384), Dagny, LLC, (24-15387), Daisyland, LLC, (24-15390), Darcy, LLC, (24-15392), Darden, LLC, (24-15394), Debrox, LLC, (24-15396), Derby, LLC, (24-15397), Dion, LLC, (24-15398), Direct, LLC, (24-15399), Distinctive, LLC, (24-15400), Dorchester, LLC, (24-15401), MGIL LLC, (24-15402), Real Soil, LLC, (24-15403), Real Taxes, LLC, (24-15405), Regal, LLC, (24-15406), S.T.E.P.A., Inc., (24-15407), STTA LLC, (24-15408), Super I, LLC, (24-15410), Vital, LLC, (24-15412), and Vivid, LLC (24-15414). They are jointly referred to as the "Debtors." The Debtors are not Defendants.

## III. PARTIES

### A. The Plaintiff.

9. City of Chicago (the "City"). The City is a municipal corporation organized and existing under the laws of the State of Illinois. The City brings this action not in its individual capacity, but derivatively, with the powers of the chapter 7 trustee of the Debtors' estates (the "Trustee") pursuant to court order dated December 16, 2025 (the "Standing Order"). *See* Bankr. Dkt. No. 739.

### B. The Individual Defendants.[2]

10. Suzie Baba Wilson ("Wilson"). Wilson is an individual. She is, or was at all relevant times, the president, secretary, director, member, manager or controlling beneficiary of every corporation, LLC, and trust, named in this Complaint (including the Debtors). At all relevant times, along with her sister Swedlana Dass, Wilson controlled every one of the Debtors and every other Defendant named in this Complaint. She now resides in Florida at 308 Chantilly Trail, Bradenton, Florida, a property she purchased in 2026 for approximately $950,000 in cash. Prior to that she resided with her sister, Dass, at 1683 Braeside Lane, Northbrook, Illinois.

11. Swedlana Dass ("Dass"). Dass is an individual and Wilson's sister. She is or was the record owner of most of the Parent Entities within the enterprise, as described below. At all relevant times, Wilson and Dass together controlled every one

[2] The relationship between the Debtors, the individual Defendants, and the enterprise Defendants is depicted in an organizational chart attached as **Exhibit A**. (Exhibit A is offered as an aid to the reader and is not a substitute for the allegations of this Complaint. It was prepared in an 11 in x 17 in format).

of the Debtors and every other Defendant named in this Complaint. She resides at 1683 Braeside Lane, Northbrook, Illinois, a home she shared with her sister, Wilson, until recently. Wilson and Dass together are the "Sisters."

## C. The Enterprise Defendants (and Debtors).

### *1. The "Primary Entities"*

12. The "Primary Entities" include 6 parent corporations — SNS General Corp., Comma Corp., Random Corp., Solo Land Corp., Discount Inn, Inc., and Vincennes Corp. (collectively, the "Parent Entities"), and their 22 later created subsidiary LLCs, as provided in this section. All of the Parent Entities are Defendants as are 5 subsidiaries. The remaining 17 subsidiaries are Debtors.

13. SNS General Corp. A Defendant. An Illinois corporation formed on July 20, 1992. Wilson is its president, secretary, and director. Dass is its former treasurer and director, and its owner. Wilson as president lists her address as a UPS Store mailbox at 2516 Waukegan Rd., #339, Glenview, IL (the "UPS Store"). Douglas Belofsky is its registered agent. In January 2008, the Illinois limited liability company (identified below) was created as an SNS General subsidiary. SNS General quit-claimed into it, without consideration, its least valuable and most liability-laden properties, in the same manner as the other Parent Entities in this section. SNS General was its sole member and sole manager until 2023, when FCOC was installed as the nominal manager. The UPS Store is the subsidiary's principal place of business and Douglas Belofsky is its registered agent too. SNS General remains the sole member. The subsidiary is:

a. Super I, LLC. A Debtor. Case No. 24-15410. Created January 3, 2008.

14. Comma Corp**.** A Defendant. An Illinois corporation formed on September 24, 1992. Wilson is its president and secretary. Dass is its former agent. Wilson as president lists her address as the UPS Store. Douglas Belofsky is its registered agent. In 2008, the Illinois limited liability company (identified below) was created as a Comma Corp. subsidiary. Comma quit-claimed into it its real properties. Comma Corp. was its sole member and sole manager until 2023, when NRH was installed as the nominal manager. The UPS Store is the subsidiary's principal place of business and Douglas Belofsky is its registered agent too. Comma Corp. remains the sole member. The subsidiary is:

a. Common I, LLC. A Defendant. Created January 3, 2008.

15. Random Corp. A Defendant. An Illinois corporation formed on September 24, 1992. Wilson converted Random to a Florida corporation in late 2025. It was then redomesticated in Illinois on July 23, 2026 (Discount Inn followed the same path). Wilson is its president, secretary, and director. Dass is its former treasurer and director, and its owner. Wilson as president lists her address as the UPS Store. Douglas Belofsky is its registered agent. Random acquired more than 162 properties. Between November 2007 and January 2008, three Illinois limited liability companies (identified below) were created as Random subsidiaries. Random quit-claimed into them, without consideration, its least valuable and most liability-laden properties, in the same manner as the other Parent Entities in this group. A fourth subsidiary was created in 2013 for the same purpose. Random was the sole member and sole manager

of each subsidiary until 2023, when NRH was installed as the nominal manager. All four share the UPS Store as their principal place of business and Douglas Belofsky is their registered agent too. Random remains the sole member of each. Three subsidiaries are Debtors. One subsidiary is a Defendant, non-Debtor. The subsidiaries are:

a. Rovo, LLC. A Defendant. Created August 1, 2013.

b. Real Soil, LLC. A Debtor. Case No. 24-15403. Created January 3, 2008.

c. Real Taxes, LLC. A Debtor. Case No. 24-15405. Created January 3, 2008.

d. Regal, LLC. A Debtor. Case No. 24-15406. Created November 26, 2007.

16. Solo Land Corp. A Defendant. Solo Land Corp. is an Illinois corporation formed on October 13, 1992. Wilson is its president and secretary. Wilson as president lists her address as the UPS Store. Douglas Belofsky is its registered agent. In 2008 the Illinois limited liability company (identified below) was created as a Solo Land Corp. subsidiary. Upon information and belief, the subsidiary was created for the same purpose as all the other subsidiaries, to insulate its parent company, Solo Land. Solo Land sold its most valuable property for $1,000,000 shortly before June 2008, however, which made the planned transfers unnecessary; they never occurred. The subsidiary is:

a. Simple Solo, LLC. A Defendant. Created February 6, 2008. Involuntarily dissolved August 14, 2015.

17. Discount Inn, Inc. A Defendant. An Illinois corporation formed on November 1, 1995. Wilson is its president, secretary, and director. Dass is its former president and director, and its owner. Wilson as president lists her address as the UPS Store.

Douglas Belofsky is its registered agent. Wilson converted Discount Inn to a Florida corporation on or about May 5, 2026. It was then redomesticated in Illinois on July 23, 2026 (the same as Random Corp). It acquired more than 900 properties in its own name, beginning in 2000. In August and September 2007, twelve Illinois limited liability companies (identified below) were created as Discount Inn subsidiaries. Discount Inn quit-claimed into them, without consideration, hundreds of its least valuable and most liability-laden properties, in the same manner as the other Parent Entities in this group. Discount Inn was the sole member and sole manager of each until 2023, when FCOC was installed as the nominal manager. All twelve share the UPS Store as their principal place of business and Douglas Belofsky is their registered agent. Discount remains the sole member. Eleven subsidiaries are Debtors. One, Dulce, is not a Debtor but a Defendant. The subsidiaries are:

a. Dulce, LLC. A Defendant. Created on August 23, 2007.
b. Dagny, LLC. A Debtor. Case No. 24-15387. Created on August 23, 2007.
c. Darcy, LLC. A Debtor. Case No. 24-15392. Created on August 23, 2007.
d. Darden, LLC. A Debtor. Case No. 24-15394. Created on August 23, 2007.
e. Debrox, LLC. A Debtor. Case No. 24-15396. Created on August 23, 2007.
f. Derby, LLC. A Debtor. Case No. 24-15397. Created on August 23, 2007.
g. Dion, LLC. A Debtor. Case No. 24-15398. Created on August 23, 2007.
h. Direct, LLC. A Debtor. Case No. 24-15399. Created on August 23, 2007.
i. Distinctive, LLC. A Debtor. Case No. 24-15400. Created on August 23, 2007.

j. Dorchester, LLC. A Debtor. Case No. 24-15401. Created on August 23, 2007.

k. Dover I, LLC. A Debtor. Case No. 24-15384. Created on August 23, 2007.

l. Daisyland, LLC. A Debtor. Case No. 24-15390. Created on September 12, 2007.

18. Vincennes Corp. A Defendant. An Illinois corporation formed on August 3, 2001. Wilson is its president and secretary. Dass is its owner. Wilson as president lists her address for the company as her Florida home at 308 Chantilly Trail, Bradenton, Florida. Douglas Belofsky is its registered agent. It acquired more than 77 properties. Vincennes also held real property, which it conveyed in April 2026 as described below. In 2008, the three Illinois limited liability companies (identified below) were created as Vincennes subsidiaries. Vincennes quit-claimed into them, without consideration, its least valuable and most liability-laden properties, in the same manner as the Parent Entities in this group. Vincennes was the sole member and sole manager of each until 2023 when either FCOC or NRH were installed nominal managers. All three share the UPS Store as their principal place of business and Douglas Belofsky is their registered agent. Vincennes remains the sole member. The subsidiaries are:

a. Victorious, LLC. A Defendant. NRH was installed as the nominal manager in 2023. Created on February 6, 2008.

b. Vital, LLC. A Debtor. Case No. 24-15412. FCOC was installed as the nominal manager in 2023. Created on February 6, 2008.

c. Vivid, LLC. A Debtor. Case No. 24-15414. FCOC was installed as the nominal manager in 2023. Created on February 6, 2008.

### *2. The "Secondary Entities"*

19. The "Secondary Entities" are parent corporations, B.A.S.S. & M, Inc., and S.T.E.P.A., Inc., and their later created subsidiaries, STTA, LLC, and MGIL, LLC, as provided in this section. All the entities in this group are Debtors.

20. B.A.S.S. & M., Inc. A Debtor, Case No. 24-15381. An Illinois corporation formed on April 3, 1995. Wilson is its president, secretary, and director. Dass is a director. It is owned by Wilson, Dass, and their brother Ashoor Baba. Ashoor Baba has no meaningful control over it. Wilson as president lists her address as the UPS Store. Douglas Belofsky is its registered agent. In 2023, the South Dakota limited liability company (identified below) was created as a B.A.S.S. & M. subsidiary and B.A.S.S. & M. is its nominal member and manager. That subsidiary list 25 First Ave., Ste A., Watertown, South Dakota (the "SD Mailbox"), as its principal place of business. B.A.S.S. & M. owned significant real estate in its own name until 2023, when it was transferred, by quit claim deed, for no consideration to its subsidiary contemporaneously with its creation. The subsidiary is:

a. STTA, LLC. A Debtor. Case No. 24-15408. Created on September 22, 2023.

21. S.T.E.P.A., Inc. A Debtor, Case No. 24-15407. An Illinois corporation formed on October 13, 1999. Wilson is its president, secretary, and sole owner. Wilson as president lists her address as the UPS Store. Douglas Belofsky is its registered agent. In 2023, the South Dakota limited liability company (identified below) was created as a S.T.E.P.A. subsidiary and S.T.E.P.A. is its nominal member and manager. That

subsidiary list the SD Mailbox as its principal place of business. S.T.E.P.A. owned significant real estate in its own name until 2023, when it was all transferred, by quit claim deed, for no consideration to its subsidiary contemporaneously with its creation. The subsidiary is:

a. MGIL, LLC. A Debtor, Case No. 24-15402. Created on September 22, 2023.

***3. The "Affiliate Entities"***

22. The "Affiliate Entities" are the parent entity, Pulse Path, LLC, and its subsidiary Beam of Canaan, LLC, and entities Clark, LLC, Lot Acquisition, LLC, Real Building, LLC, MNM Realty, Inc., S & M Development I, Corp., Turner Properties, Inc., and 4311 West Palmer, Inc. All of the entities in this group are Defendants.

23. Pulse Path, LLC. A Defendant. Pulse Path, LLC, is a Delaware limited liability company formed on March 13, 2025, after the Petition Date. Its only identified function is to serve as the member of its subsidiary — Beam of Canaan, LLC.

a. Beam of Canaan, LLC. A Defendant. It is a Delaware limited liability company formed on February 24, 2025. On March 6, 2025, the Sisters conveyed two personally owned properties to it for no consideration, including 6235 N. Mozart Street. The Sisters control and own both. The Mozart property was subsequently transferred into a litigation-timed trust as provided below and listed for sale for $999,000.00.

24. Turner Properties, Inc. A Defendant. It is an Illinois corporation formed on August 3, 2001. Wilson is the president and secretary. Dass is its former director, and it was the vehicle through which the Enterprise expanded into Sangamon County,

Illinois. Wilson as president lists her address for the company as her Florida home at 308 Chantilly Trail, Bradenton, Florida. Douglas Belofsky is its registered agent. It acquired more than 60 properties through tax sales.

25. MNM Realty, Inc. A Defendant. It is an Illinois corporation formed on February 18, 2004. Wilson is the president and secretary. Wilson as president lists her address as the UPS Store. Douglas Belofsky is its registered agent. It acquired more than 30 properties by 2007.

26. Clark, LLC. A Defendant. An Illinois limited liability company formed on July 23, 2007. It lists its principal place of business as the UPS Store and Douglas Belofsky is its registered agent. Wilson is its former manager and FCOC is its nominal manager. It acquired properties through tax sales.

27. Lot Acquisition, LLC. A Defendant. An Illinois limited liability company formed on August 7, 2007. Wilson is its former manager and FCOC is its nominal manager. It lists its principal place of business as the UPS Store and Douglas Belofsky is its registered agent. It acquired properties through tax sales.

28. Real Building, LLC. A Defendant. An Illinois limited liability company formed on July 30, 2007. Wilson is its former manager and FCOC is its nominal manager. It lists its principal place of business as the UPS Store and Douglas Belofsky is its registered agent. It acquired properties through tax sales.

29. S & M Development I Corp. A Defendant. It is an Illinois corporation formed on April 17, 2000. Wilson is the president and secretary. Wilson as president lists her address for the company as the UPS Store. Douglas Belofsky is its registered agent.

It acquired properties through tax sales.

30. 4311 West Palmer, Inc. A Defendant. It is an Illinois corporation formed on September 2, 2010. Wilson is its president, secretary, and director. Wilson as president lists her address as the UPS Store. Douglas Belofsky is its registered agent. It was created to hold property at 4311 W. Palmer St. in Chicago that it obtained through a property tax sale shortly after creation. It conveyed that property in April 2025, after the Petition Date, to a litigation-timed trust as provided below, and then that land trust sold the property in December of 2025 for $525,000. This entity was then dissolved on May 26, 2026.

***4. The "SD Manager Entities"***

31. The "SD Manager Entities" are FCOC, LLC, and NRH, LLC. These entities were created in September of 2023 immediately after the City started vigorously pursuing the Debtors and other Defendants to collect on municipal violations.

32. FCOC, LLC. A Defendant. It is a South Dakota limited liability company formed on September 13, 2023 (the same day as NRH and only nine days before STTA and MGIL). It lists the SD Mailbox as its principal place of business, the same as the other South Dakota defendants including Matthew's purported entity, 10635 S Wentworth LLC. It is the nominal manager of the eleven Debtors — Dagny, Daisyland, Darcy, Darden, Debrox, Derby, Dion, Direct, Distinctive, Dorchester, and Dover — and 7 Defendants — Dulce, Super I, Vital, Vivid, Clark, Lot Acquisition, and Real Building.

33. NRH, LLC. A Defendant. It is a South Dakota limited liability company

formed on September 13, 2023 (the same day as FCOC and only nine days before STTA and MGIL). It lists the SD Mailbox as its principal place of business, the same as the other South Dakota defendants including 10635 S Wentworth LLC. It is the nominal manager of three Debtors — Real Soil, Real Taxes, and Regal — and three Defendants — Rovo, Common I, and Victorious).

***5. The "Children Entities"***

34. The "Children Entities" consists of Tax Property Investment Fund, LLC, NSW Assets, LLC, NSW Properties, LLC, and 10635 S Wentworth LLC. They are all nominally owned and managed by Wilson's adult children who are also Dass's niece and nephew. All entities in this group are Defendants.

35. <u>Tax Property Investment Fund, LLC.</u> A Defendant. It is a Delaware limited liability company formed on February 18, 2020, by Wilson and Dass. While Wilson and Dass formed the entity and were its original members and managers, Nicole S. Wilson ("Nicole") and Matthew Wilson ("Matthew") are now its nominal managers and members. Nicole and Matthew are Wilson's adult children and Dass's niece and nephew. It lists the UPS Store as its principal place of business and a different UPS Store mailbox at 8955 US Hwy. 301 N., #316, Parrish, Florida, as Matthew's address as Manager (the same address listed in Discount Inn's Florida filings as Suzie Wilson's address). This UPS mailbox is fewer than 8 miles from Wilson's Florida home. Registered Agents Inc., 2501 Chatham Rd., Ste. R., Springfield, Illinois, is its registered agent (also the same for Discount Inn's Florida filings). It is now the Enterprise's primary active acquisition vehicle, participating in property tax actions and

filing suits to obtain real property deeds. Wilson personally keeps its books, drafts its leases, collects its rent, and manages its petitions for tax deeds.

36. NSW Assets, LLC. A Defendant. It is an Illinois limited liability company formed on March 23, 2022, the same day as NSW Properties. Nicole is the nominal manager and member. It lists the UPS Store as its principal place of business and lists the UPS Store as Nicole's address as manager. It was terminated on May 27, 2026.

37. NSW Properties, LLC. A Defendant. It is an Illinois limited liability company formed on March 23, 2022, the same day as NSW Assets. Nicole is the nominal manager and member. It lists the UPS Store as its principal place of business and lists the UPS Store as Nicole's address as manager. It is not in good standing.

38. 10635 S Wentworth LLC. A Defendant. It is a South Dakota limited liability company formed on October 7, 2024, nine days before the Petition Date. Matthew is its nominal manager and member. It lists its principal place of business as the same address as STTA, MGIL, FCOC, and NRH, all controlled by Wilson and Dass. The tax deed transferring 10635 S. Wentworth, Chicago, to this entity was prepared and executed by Suzie Wilson. The deed provided that future tax bills should be sent to the UPS Mailbox, controlled by Wilson. This entity sold the Wentworth property in January of 2026 for $140,000. On October 17, 2024, one day after the Petition Date, Suzie Wilson executed a deed as Grantee transferring 7212 S. Ashland Ave., Chicago, to this entity. It then sold that property in April of 2025 for $22,000.

### *6. The "Litigation-Timed Trusts"*

39. The "Litigation-Timed Trusts" consist of all of the Chicago Title Land Trust Company land trusts described in this section. There were all created in 2025 and 2026 and settled with assets from other Defendants.

40. Chicago Title Land Trust Company. A Defendant, named solely in its capacity as trustee of the five Illinois land trusts identified below, and not individually. Wilson and Dass control all of these trusts. Those trusts are:

a. Trust 9002348628, created April 15, 2025, and funded April 18, 2025, with the assets of 4311 West Palmer, Inc., for no consideration;

b. Trust 9002350979, created April 6, 2026, and funded April 8, 2026, with property of Solo Land Corp. for no consideration;

c. Trust 9002350981, created April 6, 2026, and funded April 8, 2026, with 6235 N. Mozart Street, conveyed by Beam of Canaan, LLC, for no consideration and later listed for sale at $999,000;

d. Trust 9002351104, created April 6, 2026, and funded April 8, 2026, with the condominium of Discount Inn, Inc., for no consideration and later listed for sale at $1,395,000; and

e. Trust 9002351106, created April 6, 2026, and funded April 8, 2026, with property of Vincennes Corp., for no consideration and later listed for sale at $285,000.

## IV. FACTS COMMON TO ALL COUNTS

### A. Enterprise Overview.

41. For more than three decades, Wilson and Dass have operated a single real estate enterprise through more than forty entities, including the Debtors and the Defendants named here (the "Enterprise"). The Enterprise has one business — acquiring distressed real estate at tax sales, holding it, renting it, and selling it — and one set of decision-makers: the Sisters. They created every entity, controlled every account, and directed every transfer. The entities exist on paper only. The Sisters are the Enterprise.

42. The Sisters formed entities by the dozen, but they never ran as separate and distinct operations. They observed no corporate formalities. They moved assets, funds, and liabilities among the entities at will — between parent and subsidiary, and across entities with no relationship to one another at all — without documentation, consideration, or regard for which entity owned what. Whichever entity had cash paid the Enterprise's bills, regardless of which entity owed them. When no entity had cash, the Sisters paid the bills themselves. No entity was ever left with enough money to operate independently, because the Sisters withdrew funds as fast as they came in and held them in their personal accounts.

43. The Enterprise ran on volume and on a single sorting principle. Properties that made money went to entities the Sisters preferred, and the profits went to the Sisters personally. Properties that cost money — those burdened by maintenance obligations and municipal fines — went to the Debtors. When a Debtor turned a profit

anyway, the Sisters moved the property to another entity or took the proceeds out. What stayed with the Debtors was liability, unaccompanied by any asset with which to pay it.

44. That allocation was not accidental. The Sisters cast the Debtors as the unlucky corner of the Enterprise, undone first by the City's ticketing and the 2008 recession and later by the City's collection efforts in 2023. But the Debtors did not just happen to hold the violation-ridden properties. The Sisters built the Debtors to hold them — to absorb the carrying costs and code violations of the Enterprise's failed investments, while the profitable investments stayed elsewhere, and the proceeds were funneled to the Sisters personally.

45. The scheme has never stopped. It survived the City's 2023 collection efforts and the filing of these bankruptcy cases, and it continues today. Within two days of the City's April 6, 2026, motion to compel, the Sisters quit-claimed several of the Defendants' most valuable remaining properties into newly created Illinois land trusts. In the past two years alone, the Sisters have taken millions out of the Enterprise — including the $950,000 in cash Wilson used to buy a Florida home to take advantage of that state's homestead exemption — and Enterprise property is listed for sale right now. The Debtors' creditors are left holding the bag. Equity requires a different result.

## B. Enterprise Timeline.[3]

### *1. Enterprise Creation (1991 — 2007)*

46. The Enterprise was born in 1991 before the first property tax purchasing entities were even formed. That year, the Sisters took title to property through Random and Solo Land – neither of which had been incorporated yet.

47. The Sisters created their first property tax purchasing entities within a few months of each other in 1992. SNS General, Comma Corp., Random Corp., and Solo Land Corp. were all formed that year.

48. The Sisters also conducted early operations through Comma.

49. Random alone acquired at least 162 properties between 1991 and 2008, sold a portion of its lots, and generated at least $1,436,500 in sale proceeds.

50. In that same time period, Solo Land generated at least $1,058,000 in sale proceeds.

51. In 1995 the Sisters apparently decided they didn't have enough land acquisition vehicles, so they formed B.A.S.S. & M., Inc., and Discount Inn, Inc., in that year.

52. B.A.S.S. & M. acquired dozens of properties, sold some of them, and generated at least $416,000 in sale proceeds by 2008.

53. Discount Inn – the largest expansion – acquired at least 900 properties beginning in 2000, sold some of them, and generated at least $10,425,000 in sale

[3] The chronology of the creation of the Enterprise defendants and Debtors is depicted in the table and timeline attached as **Exhibit B**. (Exhibit B is offered as an aid to the reader and is not a substitute for the allegations of this Complaint.)

proceeds.

54. The Sisters went through another expansion period between late 1999 and 2001. S.T.E.P.A., Inc., was formed in 1999, S & M Development I, Inc., in 2000, and Vincennes Corp. in 2001.

55. Vincennes acquired at least 77 properties between 2001 and 2008, sold a portion of them, and generated at least $1,075,000 in sale proceeds.

56. S.T.E.P.A. and S & M Development together acquired at least 168 more properties, including some transferred among those entities by quit-claim deed.

57. Not wanting to be limited to the Chicagoland area, Wilson and Dass also created Turner Properties, Inc., in 2001, to expand their operations to Sangamon County, and the Springfield, Illinois area. Turner Properties ultimately acquired over 60 properties in Sangamon County and other areas.

58. In 2004 the Sisters formed MNM Realty, Inc., and by 2007, MNM Realty had acquired at least 30 properties, sold some of them, and generated at least $566,500.

59. In July of 2007, the Sisters formed Clark, LLC, and Real Building, LLC.

60. Clark and Real Building acquired an additional 50 properties for the Enterprise in surrounding counties.

61. By this time corporate formalities were already gone, and the single Enterprise had already taken shape. In at least one instance, Discount Inn purchased the delinquent taxes on a property, yet the Sisters directed that title to be issued to Turner Properties instead. If fact, it appears at the time Discount Inn was the tax purchaser of the Enterprise, but other entities would take some of the properties

without any consideration paid to Discount Inn.

62. But there is a fundamental flaw in the Enterprise's business model: it depends on volume, as the Sisters then noticed.

63. The Sisters acquired more than one thousand properties, gambling that a portion would become profitable investments capable of being flipped quickly for gain.

64. The strategy generated profits for Wilson and Dass. It also left them holding hundreds of unprofitable lots incurring thousands of dollars in violations a year.

65. Maintaining those hundreds of lots cost money – money that would have reduced the Sisters' profits. Rather than absorb that cost, the Sisters neglected the properties' maintenance obligations. Afterall, they did not have to live next to any of the health hazards they created.

66. Beginning in 2000, the City began ticketing Random for failure to maintain its properties in compliance with the health and safety provisions of its municipal code.

67. In 2003, the City began ticketing Discount Inn, SNS General, and Vincennes for failure to maintain their properties in compliance with the health and safety provisions of the municipal code.

68. Within a few years, the Enterprise was accruing hundreds of tickets annually and the City began recording judgment liens against the properties.

69. Even as the Sisters' valuable properties held their worth, the mounting liabilities tied to the distressed lots threatened those valuable properties with additional liens and enforcement exposure.

### *2. Sorting the Enterprise Entities to Shield Assets (2007 — 2023)*

70. Faced with being held accountable for negligently maintaining hundreds of lots and having to pay tens of thousands in municipal fines, the Sisters designed and implemented a scheme: create a series of shell companies and quit-claim the distressed properties into them while maintaining the profitable properties in the parent entities or other entities they created, such as the Affiliate Entities.[4]

71. The Sisters used the Primary Entities, as well as other entities, to execute this scheme.

72. The Sisters proceeded to create a total of 21 subsidiaries across six Parent Entities — Discount Inn spawned 12 subsidiaries, Random spawned 3, SNS General spawned 1, Vincennes spawned 3, Comma spawned 1, and Solo Land spawned 1.

73. The Sisters caused the most liability-ladened properties to be transferred to these newly created shell subsidiaries immediately.

74. Between August and September 2007, Wilson and Dass formed the Debtors under Discount Inn (Dagny, Daisyland, Darcy, Darden, Derby, Dion, Direct, Dorchester, and Dover I) and Defendant Dulce.

75. The 12 entities were functionally interchangeable, sharing a sole member (Discount Inn), sole manager (Discount Inn), a registered agent and office, and

[4] The Sisters apparently disliked having to maintain their lots to any minimal standard, so Discount Inn sued the City asserting its weeds ordinance was unconstitutional. They lost at the district court, *Discount Inn, Inc. v. City of Chicago*, 72 F. Supp. 3d 930 (N.D. Ill. 2014), and at the Seventh Circuit, *Discount Inn, Inc. v. City of Chicago*, 803 F.3d 317 (7th Cir. 2015). Their petition for certiorari to the Supreme Court was denied. *Discount Inn, Inc. v. City of Chicago,* 577 U.S. 1143 (2016).

substantially similar operating agreements.

76. On June 16, 2008, Wilson and Dass transferred from Discount Inn approximately:

a. 62 properties to Dagny;

b. 59 properties to Daisyland;

c. 67 properties to Darcy;

d. 65 properties to Darden;

e. 62 properties to Debrox;

f. 69 properties to Derby;

g. 69 properties to Dion;

h. 63 properties to Direct;

i. 72 properties to Distinctive; and

j. 35 properties to Dorchester.

77. No consideration was exchanged for any of the transfers.

78. The Sisters kept Discount Inn's most valuable properties for themselves, including a luxury condominium later listed for $1,395,000 and a single-family home listed for $330,000.

79. Between November 2007 and January 2008, Wilson and Dass formed the Random Corp subsidiaries that are now Debtors (Real Taxes, Real Soil, and Regal).

80. The three entities were functionally interchangeable, sharing a sole member (Random), sole manager (Random), a registered agent and office, and substantially similar operating agreements.

81. On June 16, 2008, Wilson and Dass transferred from Random approximately:

a. 42 properties to Real Soil;

b. 52 properties to Real Taxes; and

c. 16 properties to Regal.

82. No consideration was exchanged for any of the transfers.

83. The Sisters used Random to spawn an additional subsidiary, Rovo, LLC, a few years later, but for the same purpose.

84. In January 2008, the Sisters formed Debtor Super I as the subsidiary of SNS General.

85. On June 16, 2008, Wilson and Dass transferred 22 properties from SNS General to Super I. No consideration was exchanged.

86. On December 23, 2009, Wilson and Dass transferred 8 properties from SNS General to Super I. No consideration was exchanged.

87. On December 23, 2011, Wilson and Dass transferred 3 properties from SNS General to Super I. No consideration was exchanged.

88. The Sisters kept SNS General's most valuable properties, including a luxury condominium recently sold for $480,000.

89. In February 2008, Wilson and Dass formed the Vincennes subsidiaries including Debtors Vital and Vivid and Defendant Victorious.

90. The three entities were functionally interchangeable, sharing a sole member (Vincennes), sole manager (Vincennes), a registered agent and office, and substantially similar operating agreements.

91. On June 16, 2008, Wilson and Dass transferred from Vincennes approximately:

a. 35 properties to Victorious;

b. 16 properties to Vital; and

c. 34 properties to Vivid.

92. No consideration was exchanged for any of the transfers.

93. On January 3, 2008, Wilson and Dass formed Common I as a subsidiary of Comma Corp.

94. On June 16, 2008, Wilson and Dass transferred Comma's properties to Common I. No consideration was exchanged.

95. On February 8, 2008, Wilson and Dass formed Simple Solo as a subsidiary of Solo Land Corp.

96. Upon information and belief, Simple Solo was created for the same purpose as all the other subsidiaries, to insulate its parent company, Solo Land. Solo Land sold its most valuable property for $1,000,000 shortly before June 2008, however, which made the planned transfers unnecessary; they never occurred.

97. The scheme achieved its intended purpose: the City began ticketing the subsidiaries (including the Debtors), not the parent entities, and began recording judgment liens against the subsidiaries, not the parent entities.

98. At all relevant times, the subsidiaries were indebted to the City and were generally not paying their debts as they came due. *See* Dkt. No. 400-1.

99. Over time, however, some of the properties the Sisters had pushed into the

Debtors turned out to retain real market value. The Sisters responded by shifting those specific assets back out of the Debtors and into the parent entities or other entities controlled by the Sisters.

100. On February 10, 2010, the Sisters transferred to Discount Inn roughly:

a. 9 properties from Dagny;

b. 14 properties from Daisyland;

c. 4 properties from Darcy;

d. 4 properties from Darden;

e. 7 properties from Debrox;

f. 4 properties from Derby;

g. 2 properties from Dion;

h. 3 properties from Direct; and

i. 1 property from Dorchester.

101. The transferors received nothing in exchange for the transfers.

102. That same day, the Sisters transferred roughly 43 of those 48 properties from Discount Inn to Dover I. No consideration was exchanged, even though Dagny, Daisyland, Darcy, Darden, Debrox, Derby, Dion, and Direct do not have an ownership interest in Dover I.

103. In short, 43 of the 48 properties went up to Discount Inn and then immediately back down to Dover I. The transfers were for no consideration while all these prior owners owed considerable debts to their creditors, namely the City.

104. The transfers enriched Discount Inn and Dover I while leaving the burdens

of the unprofitable lots with the other subsidiaries.

105. Discount Inn received at least five properties from its subsidiaries for no consideration and while those subsidiaries were extremely indebted. Those properties include: 401 W 103rd Place (later purchased by the Chicago Transit Authority for $400,000), 4600 W. Flournoy Street (listed for $425,000), 7236 S. Ashland Avenue (sold for $85,000), and 7326 and 7328 S. Ashland Avenue (still generating rental income).

106. In 2019, Wilson and Dass caused Discount Inn to transfer one of those properties, 401 W. 103rd Place to Defendant Dulce — the only one of the 12 Discount Inn subsidiaries that did not file for bankruptcy.

107. No consideration was exchanged for this transfer.

108. This was because Dulce did not have significant tickets yet, nor did it have liens recorded against it. Therefore, it could be sold without having to pay the City.

109. During subsequent condemnation proceedings for that property, Dulce, Discount Inn, and Dion all identified themselves as owners of the property. On November 18, 2024, Wilson requested that the condemnation check be sent to the Sisters' home address in Northbrook; the Sisters quickly transferred those proceeds out of Dulce to themselves.

110. The Sisters funneled the remaining valuable properties from Discount Inn to Dover I specifically because, unlike its sibling entities, Dover I had not yet drawn any ticketing or enforcement action. Roughly 43 properties ended up there.

111. As a result, between January 1, 2022, and the Petition Date, Dover I

generated at least $192,856.46 – far more than the other Debtors — Darden ($0), Debrox ($1,500), Derby ($0), Dion ($0), Direct ($0), Dagny ($75,562.62), Daisyland ($59,307.92), Darcy ($28,303.40), or Distinctive ($29,700.36).

112. The Sisters ran the identical playbook the same day with Random, Regal, Real Taxes, and Real Soil: on February 10, 2010, Wilson and Dass caused to be transferred to Random approximately:

a. 21 properties from Real Soil;

b. 46 properties from Real Taxes; and

c. 10 properties from Regal.

113. No consideration was exchanged.

114. Wilson and Dass transferred approximately 32 of those 77 properties to Regal that same day. No consideration was exchanged, even though Real Soil and Real Taxes have no ownership interest in Regal.

115. Random received at least 45 valuable properties that way – 14 sold for roughly $1,605,000, 6 were listed for $535,000, and 25 more, on information and belief, are valuable properties actively generating rental income.

116. The Sisters later moved two of Regal's former properties from Random to Rovo (created in 2013 and the only Random subsidiary not to file for bankruptcy) without consideration. Rovo sold one for $100,000.

117. Between January 1, 2022, and the Petition Date, Regal generated at least $111,884.77 – far more than Real Taxes ($0) or Real Soil ($44,747).

118. The Sisters ran the same playbook with Vincennes, Vital, Vivid, and

Victorious. On December 9, 2009, the Sisters transferred all 35 of Victorious's properties to Vincennes. One day later, they transferred those 35 properties (plus one more) to Vital. On February 10, 2010, they transferred 11 properties back from Vital to Vincennes; and two days later, they transferred 5 of those properties on to Victorious. Vital and Vivid have no ownership interest in Victorious. The Sisters diverted 6 properties to Vincennes this way – three sold for roughly $150,000, two were listed for $425,000, and one, on information and belief, is a valuable property actively generating rental income – and diverted additional valuable properties to Victorious.

119. And this was all done while the transferring entities owed creditors, namely the City, significant sums of money.

120. The Sisters' "hot potato" treatment of individual properties illustrates how routine this shuffling became. Vincennes acquired 5706 S. Ashland Avenue on May 4, 2007. Vincennes quit-claimed it to Victorious on June 16, 2008; Victorious quit-claimed it back to Vincennes on December 9, 2009; Vincennes quit-claimed it to Vital the next day; Vital quit-claimed it back to Vincennes on February 10, 2010; and Vincennes quit-claimed it to Victorious again on February 12, 2010, which then sold it for $137,500.

121. The Sisters repeated the same scheme between SNS General and Super I: 3 properties transferred on December 28, 2009, 14 more on February 10, 2010, and 1 more on February 24, 2010, all without consideration. The Sisters diverted 18 properties this way – 9 sold for roughly $800,000, and 9 more, on information and belief, are valuable properties actively generating rental income.

122. With all their current entities getting in trouble with municipal violations, and their properties being more difficult to sell without paying creditors, namely the City, on February 18, 2020, the Sisters created Tax Property Investment Fund, LLC. Unlike all the other entities to this point, which were created in Illinois, this entity was created in Delaware, which does not have the same level of transparency regarding corporate owners as Illinois.

123. Tax Property Investment Fund was created to take over as the Enterprise's new tax purchaser and tax-deed petitioning entity. Prior to this, Discount Inn was the primary entity playing this role. It would purchase the property taxes in its name and Wilson would prosecute the tax-deed petition suits in its name. It would then distribute the tax deed rights out to the other entities, including to Matthew. The Sisters did all the work for this entity to take over this role.

124. At all relevant times, the Sisters retained exclusive control over Tax Property Investment Fund.

125. Wilson also created two entities for her daughter — Nicole S. Wilson — each using her initials in their name. She created NSW Assets and NSW Properties as Illinois limited liability companies on March 23, 2022, so that she could transfer properties to those entities too.

126. Less than a month later, Wilson "loaned" each of these entities significant sums of money by depositing directly into their bank accounts. Wilson was in control of those accounts. Wilson then removed the funds in February and October of the next year by simply withdrawing them. Leaving those entities with no funds left.

127. At all relevant times, the Sisters exclusively controlled the NSW entities too.

### *3. Concealing Control and Further Asset Transfers (2023 — 2024).*

128. While this scheme allowed the Sisters to run these entities for a long time without maintaining the properties, municipal fines piled up and by 2023 they totaled over $8 million.

129. And by then the City had had enough of the Sisters' scheme. The Sisters' chronic neglect was doing real and lasting damage to City neighborhoods and the residents that must live next to all those lots. The City started registering judgments against a significant number of these entities, mostly the Debtors, and initiated supplementary proceedings to seek judicial sale of the properties.

130. The City also began naming Wilson and Dass personally for violations on the properties that they originally transferred into the subsidiaries for the purpose of insulating themselves and the Parent Entities from those exact fines.

131. Under the City's municipal code, "owners" of a property who may be held personally liable for violations on a property include any person who has charge, care, or control of the property as an actual or apparent agent, and any person responsible for or entitled to manage the property.

132. Under the structure still in place, the Parent Entities — Discount Inn, Random, SNS General, Vincennes, Comma, and Solo Land — were still managers and members of the various Debtors and other subsidiaries created under them. And because Wilson and Dass were ultimately in control of the parents that controlled the subsidiaries, the City began ticketing Wilson and Dass personally as "owners" under

the municipal code for the violations on these properties.

133. The City was able to determine that Wilson and Dass were the controlling individuals of these entities because Illinois requires public disclosure of LLC managers and corporation officers.

134. The Sisters responded within weeks by forming FCOC, LLC, and NRH, LLC, in South Dakota, a state that, unlike Illinois, does not require public disclosure of an entity's owners or managers.

135. The Sisters then immediately changed the manager of all 12 Discount Inn subsidiaries and the SNS General subsidiary to FCOC. They changed the manager of all 4 of the Random subsidiaries and the Comma subsidiary to NRH. And then changed the Vincennes subsidiaries to a combination, Vital and Vivid to FCOC and Victorious to NRH.

136. The transfers were intended to conceal that the Sisters were the parties in control of the Debtors and other subsidiaries so that the City could not hold them accountable for the health nuisances they were causing across many City neighborhoods.

137. Wilson and Dass did not open bank accounts for NRH or FCOC.

138. The Sisters ran the same operation with B.A.S.S. & M. and S.T.E.P.A. The Sisters created South Dakota subsidiaries for B.A.S.S. & M. and S.T.E.P.A. and transferred their properties to those subsidiaries all at once. This concealed the controlling individuals behind the properties to ensure Wilson and Dass could not be held accountable.

139. While B.A.S.S. & M. and S.T.E.P.A. largely purchased their own properties directly, the Sisters managed them toward the same end as all the other entities.

140. The City began ticketing B.A.S.S. & M. in 2007 and S.T.E.P.A. in 2008 for failure to maintain their properties in compliance with the health and safety provisions of its municipal code.

141. B.A.S.S. & M. and S.T.E.P.A. rarely, if ever, remediated the violations on their properties, or paid for the tickets.

142. At all relevant times, B.A.S.S. & M. and S.T.E.P.A were indebted to the City and were generally not paying their debts as they came due. *See* Dkt. No. 400-1.

143. In July 2023, the City began ticketing Wilson and Dass personally for violations on B.A.S.S. & M. and S.T.E.P.A.'s properties, in the same way it did for the Discount Inn, Random, and other subsidiaries' properties.

144. Again, under the City's municipal code, "owners" of a property who may be held personally liable for violations on a property include any person who has charge, care, or control of the property as an actual or apparent agent, and any person responsible for or entitled to manage the property.

145. The City was able to identify Wilson and Dass as "owners" of B.A.S.S. & M. and S.T.E.P.A.'s properties because Illinois requires disclosure of the owners or managers of entities, including B.A.S.S. & M. and S.T.E.P.A., in public filings.

146. In August 2023, the City began registering its judgments against B.A.S.S. & M. and S.T.E.P.A. to initiate supplementary proceedings and force the judicial sale of their properties.

147. Again, the Sisters responded within weeks. In September 2023, they created MGIL and STTA in South Dakota, a state that, unlike Illinois, does not require public disclosure of an entity's owners or managers. This was the exact same time that FCOC and NRH were created for the same purpose of concealing the Sisters' ownership in the Parent Entities.

148. On October 2 and 3, 2023, Wilson and Dass transferred all 166 of S.T.E.P.A.'s properties to MGIL. No consideration was exchanged.

149. On October 3, 2023, Wilson and Dass transferred 13 of B.A.S.S. & M.'s 15 properties to STTA. No consideration was exchanged.

150. The transfers were intended both to shield the properties from forced judicial sale and conceal the Sisters ownership interest in the entities that owned the properties.

151. Wilson and Dass did not open bank accounts for FCOC, NRH, MGIL, or STTA. As a result, none of these entities had a financial cushion to handle unforeseen expenses arising from their property ownership or the ability to handle their routine obligations, including property taxes. Nor could they even store their funds or pay any bill they had because they had no way of doing so without bank accounts.

152. The Sister's exclusive control over the Enterprise in creating these entities is also well documented.

153. Wilson explained the maneuver herself, in a 2024 email:

> "Last year [2023], when we received tickets with the owner LLC cited and additionally Lana [Dass], Suzie [Wilson], Discount [Inn] (Sole member) name on them. We figured out the reason was that we have all our LLC's in Illinois. Not a good State for law. So Doug Belofsky, our

> Corporate attorney created South Dakota Managers for the LLCs. Once he did this, the tickets started coming only in the entity name that owns the property. Only occasionally, tickets came with entity name, my name, Lana [Dass] and Discount (The Sole Member) name.
>
> The last few days, they started sending ticket with my name, or Lana [Dass] and entity that owns it name even though they do not have a reason for sighting non owners on tickets…"

154. That email is attached as **Exhibit C**.

155. Wilson added:

> "I believe the South Dakota LLC's are the managers. But Lana [Dass] will let you know. We are keeping this in this manner due to the city's home rule law that basically anyone that has anything to do with the LLC is an owner. So to avoid such problems the managers were created."

156. That email is attached as **Exhibit D**.

157. Since fall 2023, the SD Manager Entities have been the "managers" of most of the Debtors and many of the Affiliate Entities.

158. The SD Manager Entities have never actually functioned as managers of anything. Wilson is the sole member-manager of FCOC and NRH. Dass is a former co-member-manager of each. Neither SD Manager Entity authorized any of the Debtors it purportedly manages to file for bankruptcy. At the meeting of creditors, Wilson first tried to claim that (former manager) Random had authorized the filings, before conceding, "Lana [Dass] and I would make the decision," and, for the FCOC managed Debtors: "Okay. I authorized [the filing]."

159. A lawyer for FCOC and NRH both confirmed that neither entity did anything to manage the Debtors assigned to it beyond being listed with the Illinois Secretary of State. And Wilson either forgot or misrepresented her own role at the meeting of

creditors, where she did not initially disclose that she is the sole member-manager of either SD Manager.

160. The same is true of the B.A.S.S. & M. / STTA and S.T.E.P.A. / MGIL relationships. The Sisters own and control B.A.S.S. & M., which nominally manages STTA. Wilson owns and controls S.T.E.P.A., which nominally manages MGIL. Neither B.A.S.S. & M. nor S.T.E.P.A. has ever managed STTA or MGIL, respectively, in any meaningfully operational or functional sense.

161. None of these entities have ever had employees, offices, bank accounts of their own beyond those the Sisters controlled, operating agreements the Sisters observed, or any officer, member, or manager who functioned independently of the Sisters.

***4. Enterprise Continues Unabated Postpetition (2024 — present)***

162. Filing for bankruptcy did not slow down Enterprise operations transferring property around to evade creditors and conceal assets. It sped up.

163. The Sisters have not stopped. Tax Property Investment Fund is now the Enterprise's primary active acquisition vehicle, buying distressed properties at tax sales the same way the Parent Entities did before it.

164. Consistent with the Enterprise's history, Tax Property Investment Fund sometimes takes title itself and sometimes places title in Matthew's name.

165. Tax Property Investment Fund specializes in lots near properties owned by the other Defendants and Debtors.

166. Tax Property Investment Fund leases newly acquired lots to the same long-

term tenants the other Defendants and Debtors already serve or served.

167. Also consistent with the Enterprise's history, Tax Property Investment Fund ignores its own property maintenance obligations, has already drawn tickets, and is currently indebted to the City.

168. The Sisters also use Tax Property Investment Fund to lease or list for sale properties it does not own.

169. Once the City started pursuing the other Enterprise entities and the Sisters, the Sisters also transferred their membership and manager status in Tax Property Investment Fund to Wilson's adult children, and Dass's niece and nephew — Nicole and Matthew. But the Sisters retained exclusive control.

170. Wilson herself has testified she personally manages the books and records for Tax Property Investment Fund.

171. Wilson personally drafts leases for Tax Property Investment Fund.

172. Wilson personally collects rent owed to Tax Property Investment Fund.

173. The Sisters have also begun expanding the Enterprise to Florida. Wilson recently registered Defendants Tax Property Investment Fund, 10635 S Wentworth LLC, Discount Inn, Random, SNS General, Vincennes, Solo Land, 4311 West Palmer, Comma, NSW Assets, Lot Acquisition, Common I, and MNM Realty in Florida, all sharing the same principal place of business, a UPS Store that is less than 8 miles from Wilson's new Florida home.

174. The Sisters also apparently decided that now is the time to cash out and sell their most valuable holdings in the Chicagoland area.

175. In February and March of 2025, the Sisters created Pulse Path, LLC, and Beam of Canaan, LLC, as its subsidiary, in Delaware. At the same time Wilson transferred 6235 N. Mozart Street and 2112-14 W. Devon Avenue to Beam of Canaan for no consideration.

176. In April of 2025, they created Chicago Title Land Trustee Company, Trust 9002348628. They then caused 4311 West Palmer, LLC, to transfer its property holdings to that trust for no consideration. The trust then sold the property for $525,000, in November of 2025. Wilson or the Sisters took all that money.

177. Just months ago, in April of 2026, Sisters transferred several of the Defendants' most valuable remaining assets into newly created Litigation-Timed Trusts: Discount Inn's luxury condominium (later listed for $1,395,000) to Trust 9002351104; Solo Land's property to Trust 9002350979; a Vincennes property to Trust 9002351106 without consideration; and 6235 N. Mozart Street from Beam of Canaan to Trust 9002350981 (later listed for $999,000).

178. In short, the transfers were not a one-time event decades ago or just leading up to the bankruptcy filing. They accelerated in direct response to specific enforcement milestones, and the pattern is clearest when the transfers are placed on the same timeline as the collection efforts that provoked them. That timing is itself powerful evidence that the Sisters' transfers were designed to hinder, delay, and defraud creditors—not the product of ordinary business decisions.

| Date | Event |
|---|---|
| Early 2024 | The Debtors and certain Defendants are placed under citations to discover assets; Wilson and Dass are placed under third-party citations to discover assets. |
| Spring 2024 | Rather than complying with the citations to discover assets, the Debtors, Wilson, and Dass produced altered documents to obscure information. |
| Through Oct. 2024 | The Debtors, Wilson, and Dass refuse to produce financial and tax documents. |
| Oct. 9, 2024 | The state court grants the City leave to file an emergency contempt motion over the document refusal. |
| Oct. 16, 2024 | A Rule-to-Show-Cause hearing is set for the same day the Debtors each file voluntary chapter 11 petitions, commencing these bankruptcy cases (the "Petition Date"). |
| Oct. 17, 2024 | One day after the petitions are filed, one Tax Property Investment Fund property is quit-claimed to 10635 S Wentworth LLC without consideration. |
| Mar. 6, 2025 | 2112-2114 W. Devon Ave. (later listed for $600,000) and 6235 N. Mozart St., both personally owned by Wilson, are transferred to Beam of Canaan without consideration. |
| Apr. 18, 2025 | 4311 West Palmer's assets are transferred to Trust 9002348628 without consideration; the property is sold for $525,000 roughly seven months later, in November 2025. |
| Oct. 7, 2025 | The Court converts the Debtors' cases to chapter 7, effective October 10, 2025. Bankr. Dkt. No. 709. |
| Oct. 14, 2025 | The chapter 7 Trustee is appointed. |
| Dec. 16, 2025 | The Court enters the Standing Order, granting the City derivative standing to pursue the estates' claims, including alter-ego, veil-piercing, and fraudulent-transfer claims. Bankr. Dkt. No. 739. |
| Jan. 2026 | The City files adversary proceedings against Wilson and Dass personally. |
| Feb. 3, 2026 | The Court grants the City leave to examine the Debtors' financial institutions, accountants, and lawyers. |
| Feb. 18, 2026 | The City issues subpoenas. |
| Apr. 6, 2026 | The City files a motion to compel production of documents related to the Defendants, including Discount Inn, Solo Land, Vincennes, and Beam of Canaan. |

| Date | Event |
|---|---|
| Apr. 8, 2026 — two days later | The Sisters transfer several of the Defendants' most valuable remaining assets into newly created land trusts: Discount Inn's luxury condominium (later listed for $1,395,000) to Trust 9002351104; Solo Land's property to Trust 9002350979; a Vincennes property (Trust 9002351106 – *See* Parties section) without consideration; and 6235 N. Mozart St. from Beam of Canaan to Trust 9002350981 (later listed for $999,000). |
| On or about the same period | Wilson purchases a Bradenton, Florida, mansion for $950,000 in cash—a state with a notably protective homestead exemption. |

179. Each of the transfers identified in this timeline was made without consideration. Each moved a specific, identifiable, valuable asset out of the reach of the entity that had record title and into an entity the Sisters had just created or newly repurposed. And each followed—by one or two days in the case of the October 2024 and April 2026 transfers—a specific, identifiable step in the City's or the Trustee's enforcement or discovery efforts. This is not a generic allegation of concealment, it is a specific, dated sequence showing concealment timed to specific enforcement events.

## C. The Sisters ARE the Enterprise.

180. Wilson said it herself in a February 2, 2025, email to the Debtors' bankruptcy attorneys:

> "***Lana and I are the debtors***, we do not authorize this carelessness. We want to have a judge decide on the injunction which is our right once we filed bankruptcy. Now to negotiate it is insane. The law in on our side, why are you all, at my family's cost playing this charade…
>
> I cannot concentrate [on] this because the people I hired seemed not to want ***the bankruptcy relief for me***. Stop this chaos!"

Email attached as **Exhibit E** (emphasis added).

181. Wilson is right, she and her sister are the Enterprise, and the facts vividly demonstrate that.

### *1. Enterprise Entities Failed to Observe Even Basic Legal Formalities.*

182. All evidence indicates that none of the Debtors or entity Defendants have ever created or maintained meeting minutes, written consents, or resolutions for property sales or intercompany transfers, notwithstanding governing documents that require exactly that. The Debtors do not create or maintain corporate records.

183. Illinois corporations must hold annual meetings under 805 ILCS 5/7.05. All evidence indicates neither B.A.S.S. & M. nor S.T.E.P.A. ever held one, and B.A.S.S. & M.'s own bylaws separately require annual board meetings it never held either.

184. Illinois corporations must also hold a meeting before transferring substantially all of their property, under 805 ILCS 5/11.60—a meeting B.A.S.S. & M. never held before transferring substantially all its property to STTA, and S.T.E.P.A. never held before transferring substantially all its property to MGIL.

185. All evidence indicates that none of the Debtors or entity Defendants have ever held a meeting in any meaningful or documented form.

186. Illinois law requires a real registered agent and office (805 ILCS 5/5.05; 805 ILCS 180/1-35) and a real principal place of business (805 ILCS 5/7.75; 805 ILCS 180/1-40).

187. All entity Defendants use or have recently used a UPS store mailbox as their principal place of business or use it as the personal address of their officers or managers.

188. Each Debtor used the UPS Mailbox, as did Defendants Dulce, Rovo, Victorious, MNM Realty, NSW Assets, NSW Properties, Lot Acquisition, Solo Land, Simple Solo, 4311 West Palmer, S & M Development, Turner Properties, Real Building, Comma, Common I, and Clark.

189. The Litigation-Timed Trusts, Beam of Canaan, and Tax Property Investment Fund direct tax correspondence to that same mailbox.

190. Again, this is a UPS Store mailbox (like a PO Box) not an office, and the Sisters have exclusive control over that mailbox, not Matthew or Nicole or anyone else.

191. MGIL and STTA each claim in their own governing documents that "the company conducts its business" at its registered agent's office. Neither actually does.

192. None of the required books, records, minutes, membership lists, or tax returns are kept at any of these addresses, notwithstanding the specific statutory and contractual requirements that they be.

193. S.T.E.P.A. never adopted bylaws, as Illinois law requires. *See* 805 ILCS 5/2.20.

194. MGIL's and STTA's articles of organization do not disclose the name and address of their managers, as South Dakota law requires. See S.D. Codified Laws § 47-34A-203.

195. STTA's operating agreement identifies Wilson as a purported 50% member, but the remaining 50% is unidentified and unaccounted for in the governing documents even though B.A.S.S. & M. is, in fact, STTA's true 100% member

notwithstanding what the paperwork says.

196. At the meeting of creditors, Wilson could not confirm whether the Debtors had basic organizational documents. She testified, "I don't know. I don't think [the Debtors have Operating Agreements.]"

197. That testimony is reproduced, in part:

> MR. BRANDESS: No, the Operating Agreement. I am sorry. Do you mind if I explain real quick?
>
> MR. GREENE: Yes, please.
>
> MR. BRANDESS: It is the document that controls how a business runs, so oftentimes, LLCs have Operating Agreements.
>
> MS. WILSON: No. I don't believe we do.
>
> MR. GREENE: Do you know if any of the other entities have Operating Agreements?
>
> MS. WILSON: I don't know. I don't think so.

198. Some, but not all, of the Debtors do have operating agreements and bylaws.

199. However, as Wilson's testimony reflects, they have essentially abandoned their operating agreements and bylaws for the purpose of day-to-day operations or governance.

200. For example, most of the Debtors' operating agreements confirm they are member-managed LLCs. But when the Sisters shifted the Debtors' management from the Parent Entities to NRH and FCOC, Wilson and Dass did not amend their operating agreements to reflect that change in management structure. Without the

amendment, the Debtors cannot operate in conformity with their governing documents.

201. All evidence suggests B.A.S.S. & M. failed to elect a board of directors as required under its bylaws. S.T.E.P.A. similarly failed to elect a board of directors as required under Illinois law. *See* 805 ILCS 5/8.10.

***2. Inter-Enterprise "Loans" are a Sham.***

202. The Sisters claimed the existence of inter-Enterprise loans, but those are all a sham. Instead, the Sisters funneled Enterprise proceeds to themselves personally leaving the Enterprise entities, and the Debtors particularly, severely undercapitalized. Whenever the Enterprise needed to pay for something, the Sisters would conveniently pay that expense or provide the funds to one of the Enterprise entities to pay that expense. They would then categorize the money they took out of the Enterprise in the first place, and then gave back to pay an expense, a "loan."

203. These were not loans. They just show how the Enterprise operated: the Sisters funneled Enterprise funds to themselves and held them in their personal accounts and then elected which Enterprise expenses they wanted to pay with those funds. In short, they held the Enterprise bank accounts in their own names.

204. None of these purported loans were documented, much less sufficiently documented to show respect for the corporate structures of the different entities.

205. On the Debtors' bankruptcy schedules, Wilson claims that the Debtors owe the following insiders for "payment of expenses," in each case in an unknown amount:

| Purported Creditor | Purported Debtors | Amount Scheduled | Stated Basis |
|---|---|---|---|
| Swedlana Dass | 20 of 21 | "Unknown" | Payment of expenses |
| Discount Inn, Inc. | 16 of 21 | "Unknown" | Payment of expenses |
| Random Corp. | 17 of 21 | "Unknown" | Payment of expenses |
| SNS General Corp. | 14 of 21 | "Unknown" | Payment of expenses |
| Clark, LLC | 20 of 21 | "Unknown" | Payment of expenses |
| Comma Corp. | 17 of 21 | "Unknown" | Payment of expenses |
| Victorious, LLC | 20 of 21 | "Unknown" | Payment of expenses |

206. There are few, if any, records of these loans, including:

a. No written agreements for the loans;

b. No documentation regarding the purpose of the loans;

c. No documentation regarding how the loans would be repaid;

d. No documentation regarding how the loan was distributed; or

e. No resolutions authorizing the loans.

207. Indeed, one of the lawyers for the Debtors advised in a 2025 email: "we think any and all non-debtor claims should be scheduled as 'Unknown.'…a lot of the payments giving rise to those claims were for legal fees implicating multiple debtors, and untangling amounts for each debtor is not something that can be completed in time for the project filing date."

208. This admission underscores that even counsel could not reconstruct basic intercompany accounting.

209. The Debtors did not sufficiently document the "loans" they allegedly extended to Dass either.

210. The City has identified some "loans" the Debtors allegedly extended to Dass in the below table. The only written records of these "loans" appears to be what Dass included in the check memo line. On information and belief, additional "loans" exist, and the City reserves the right to amend to reflect additional instances identified in discovery.

| Date | From | To | Amount | Check Memo Line |
|---|---|---|---|---|
| 9/16/2019 | Dover I | Dass | $600 | "will pay back" |
| 9/16/2019 | Regal | Dass | $900 | "will pay back when funds available" |
| 3/16/2020 | Regal | Dass | $129,500 | - |
| 4/29/2020 | Regal | Dass | $51,900 | "please make available now" |
| 7/1/2020 | Real Soil | Dass | $38,200 | "Will pay it to Random Corp" |
| 8/26/2021 | Real Soil | Dass | $25,000 | "Will pay back" |
| 3/4/2022 | Real Soil | Dass | $25,000 | "Will pay back" |
| 3/4/2022 | Dover I | Dass | $51,200 | "Will pay back" |
| 10/15/2022 | Real Soil | Dass | $19,700 | "Will pay back when funds available" |

211. There are few, if any, records of these loans, including:

a. No written agreements for the loans;

b. No documentation regarding the purpose of the loans;

c. No documentation regarding how the loans would be repaid; and

d. No resolution authorizing the loans.

212. Dass never repaid Dover I, Regal, or Real Taxes.

213. The same fictional-loan device runs the other direction, too.

214. On April 6 and 13, 2022, Wilson "loaned" NSW Assets $35,000 and $100,000, with memo lines reading "loan to the LLC" and "Loan from SBW to Nicole to LLC." NSW Assets never used the money, and Wilson transferred it back to herself in June 2022 and January 2024.

215. Wilson ran the identical play with NSW Properties, lending $10,000 and $60,000 in mid-2023 that NSW Properties never used, before pulling back $20,000, $15,000, $10,000, $10,000, and $13,000 between October 2023 and February 2024.

216. The Sisters have claimed on tax filings that Random "owed" Tax Property Investment Fund $53,000 in 2023, even as Wilson personally "lent" Tax Property Investment Fund $300,000 on June 24, 2023 ("loan to LLC – Tax Prop Inv Fund LLC") and then had Tax Property Investment Fund pay her $50,000 back on November 26, 2024.

217. This pattern of using an adult child's name on paper while the parent-principal controls the money and moves it around at will is precisely the fact-pattern that supports piercing the corporate veil. *See*, *e.g.*, *A.L. Dougherty Real Estate Mgmt. Co., LLC v. Su Chin Tsai*, 2017 IL App (1st) 161949, ¶¶ 7, 16–18.

***3. Across the Entire Enterprise the Sisters Funneled All Funds to Themselves.***

218. Between 2008 and the Petition Date, the Enterprise (including the Debtors) sold dozens if not hundreds of properties, generating millions of dollars.

219. Almost none of that money remains, because the Sisters transferred it to themselves or non-Debtors as soon as it arrived. This left the Debtors with a pile of debt and no money to pay it.

220. The pattern is mechanical: a Debtor or other entity owning the property earns income, and within days — sometimes hours — the Sisters move the money out.

221. Many of the sweeps were executed using interstate wires and, where documentation was mailed, by interstate mail. The table below sets out representative examples; it is not a complete list, and the City reserves the right to amend to reflect additional transfers identified in discovery.

| Sale / Payment | Selling Debtor | Debtor Received | Swept out | Amount Swept | Recipient |
|---|---|---|---|---|---|
| 10/5–10/10/17 | Regal | $99,293.40 | 10/10/17 | $99,880.00 | Random |
| 10/10–10/12/17 | Regal | $44,502.42 | 10/16/17 | $44,500.00 | Random |
| 11/17–11/28/17 | Regal | $42,660.00 | 11/28/17 | $42,660.00 | Dass (personal) |
| 1/30–1/31/18 | Daisyland | $13,704.52 | 2/5/18 | $13,650.00 | Discount Inn |
| 5/4–5/7/18<br>*Called "distributions"* | B.A.S.S. & M. | $65,919.50 | 5/9–<br>5/14/18 | $10,000<br>$10,000<br>$10,000<br>$10,000 | Dass<br>Wilson<br>Wilson<br>Ashoor Baba |
| 5/14–5/15/18 | Real Soil | $25,409.72 | 5/17/18 | $25,300.00 | Random |
| 8/23/18<br>*Called "distributions"* | B.A.S.S. & M. | $227,517.70 | 8/23–<br>8/24/18 | $105,000<br>$32,500<br>$32,500<br>$32,500 | Wilson & Dass<br>(joint)<br>Ashoor Baba<br>Wilson<br>Wilson |
| 4/12–4/15/19 | Real Soil | $11,286.52 | 4/16/19 | $11,200.00 | Random |
| 7/30/19 | Regal | $41,954.29 | 7/30/19 | $42,200.00 | Random |
| 9/27–9/30/19 | Vivid | $34,183.24 | 10/1/19 | $34,000.00 | Vincennes |
| 3/16/20 | Regal | $129,726.18 | 3/16/20 | $129,500.00 | Dass (personal) |
| 4/24–4/29/20 | Regal | $51,446.30 | 4/30/20 | $51,900.00 | Dass (personal) |
| 6/24/20<br>*proceeds paid 6/4 and 6/30/20* | Real Soil | $43,600.29 | 6/11–<br>7/2/20 | $5,300<br>$38,200 | Random<br>Dass (personal) |
| 8/20/21<br>*rent-to-own* | Dover I | $50,000.00 | 8/21/21 | $50,000.00 | Discount Inn |
| 8/21/21<br>*rent-to-own* | Real Soil | $25,000.00 | 8/26/21 | $25,000.00 | Dass (personal) |
| 3/1/22<br>*rent-to-own* | Real Soil | $25,000.00 | 3/4/22 | $25,000.00 | Dass (personal) |
| 3/1/22<br>*rent-to-own* | Dover I | $50,000.00 | 3/4/22 | $51,200.00 | Discount Inn |
| 3/20–3/24/22 | Dover I | $17,687.33 | 3/24/22 | $13,300.00 | Discount Inn |
| 4/27–4/29/22<br>*two properties* | Super I | $49,045.18 | 4/29/22 | $49,600.00 | SNS General |
| 6/22/22 | Dagny | $9,928.29 | 6/27/22 | $9,900.00 | Discount Inn |
| 9/2/22 | Distinctive | $2,919.84 | 9/8/22 | $3,700.00 | Discount Inn |

| Sale / Payment | Selling Debtor | Debtor Received | Swept out | Amount Swept | Recipient |
|---|---|---|---|---|---|
| 9/7/22<br>*rent-to-own* | Dover I | $50,000.00 | 9/9–<br>9/13/22 | $20,000<br>$20,000<br>$10,000 | Discount Inn<br>Discount Inn<br>Vincennes |
| 9/15–9/19/22 | Real Soil | $19,747.47 | 10/17/22 | $19,700.00 | Dass (personal) |
| 11/30/22<br>*at closing* | Distinctive | $6,439.73 | 12/14/22 | $6,400.00 | Discount Inn |
| 12/30/22 | Distinctive | $13,025.00 | 12/30/22 | $13,000.00 | Discount Inn |
| 3/6/23<br>*rent-to-own* | Dover I | $19,581.30 | 3/8/23 | $21,000.00 | Discount Inn |
| 4/20/23<br>*rent-to-own* | Daisyland | $25,000.00 | 5/2/23 | $25,000.00 | Discount Inn |
| 8/14–8/22/23 | Distinctive | $5,129.56 | 8/28/23 | $5,400.00 | Discount Inn |
| 8/22–8/27/23 | Dagny | $34,036.70 | 8/29/23 | $34,300.00 | Discount Inn |
| 11/8/23<br>*title company proceeds* | Dagny | $5,000.00 | 11/17/23 | $4,900.00 | Discount Inn |
| 8/21/24 | Darcy | $45,000.00 | — | *Wilson and Dass retained on information and belief* | Wilson and Dass |
| **Total:** | | **$1,283,744.48** | | **$1,233,190.00** | |

222. The transfers above are representative examples only. On information and belief, additional bank accounts, additional sale proceeds, and additional sweeps exist that the City has not yet been able to identify or trace. The pattern recurred dozens of additional times across the Debtors' history and is set out more fully in **Exhibit F**, which is incorporated into this Complaint.

### 4. *The Sisters also drained the Debtors' bank accounts directly, account by account.*

223. Beyond the sale-proceeds sweeps described above, the Sisters caused the Debtors to make additional direct transfers out of each Debtor's bank account, as set out in Exhibit F.

224. None of these transfers involved any consideration, the Sisters simply removed the funds.

225. The following table sets out the amounts diverted from each Debtor account

to each recipient the City has identified so far. There are additional bank account records the City does not have yet. On information and belief, additional transfers exist that the City has not yet been able to identify or trace.

| Debtor Account | Recipient | Total Diverted |
|---|---|---|
| B.A.S.S. & M. | Wilson & Dass (joint account) | $137,500 |
| B.A.S.S. & M. | Dass (personal account) | $13,200 |
| B.A.S.S. & M. | Wilson (personal account) | $90,000 |
| B.A.S.S. & M. | Ashoor Baba (personal account) | $45,000 |
| B.A.S.S. & M. | Random | $1,200 |
| Dagny | Discount Inn | $72,011 |
| Daisyland | Discount Inn | $52,390 |
| Darcy | Discount Inn | $65,265 |
| Darcy | Dass (personal account) | $1,300 |
| Darcy | Rovo | $550 |
| Debrox | Discount Inn | $5,850 |
| Distinctive | Discount Inn | $28,380 |
| Dover I | Discount Inn | $223,270 |
| Dover I | Vincennes | $10,000 |
| Dover I | Dass (personal account) | $57,857.22 |
| Real Soil | Random | $41,800 |
| Real Soil | Dass (personal account) | $107,900 |
| Regal | Random | $279,355 |
| Regal | Dass (personal account) | $250,060 |
| Vivid | Vincennes | $34,000 |
| Super I | Dass (personal account) | $94,620 |
| Super I | Dass (personal account) | $1,100 |
| Super I | Discount Inn | $2,400 |
| **Total:** | | **$1,615,008** |

226. The direct account draws left the Debtors with less than $1,000 on hand.

227. As a result, the Debtors had no financial cushion to handle unforeseen expenses arising from their property ownership and no ability to handle their routine obligations, including property taxes.

228. The transfers to Discount Inn, Random, SNS General, and Vincennes benefited the Sisters directly: the Sisters personally withdrew and used funds from each Parent Entity and used Random to pay for personal expenses like Dass's Maserati, SNS General to pay their American Express card, and Discount Inn to maintain Dass's luxury condominium residence. The non-Debtor entities also transferred money around themselves. Each Zelle transfer to Dass's personal account was executed by wire.

229. Additionally, these transfers show that there was no respect for corporate hierarchy or form. There is no direct line between B.A.S.S. & M. and Random, between Darcy and Rovo, Dover I and Vincennes, or Super I and Discount Inn. But these entities were transferring funds to entities that were not even their nominal parents anyway. And that is because they all operated as one seamless Enterprise for the Sisters' sole benefit. Corporate lines did not mean anything.

***5. Wilson and Dass collected the Debtors' rental income personally, so the Debtors' income never even went into their accounts.***

230. By the Petition Date, the Debtors were generating nearly $300,000 a year in rental income. Much of that money never reached a Debtor account, because the Sisters instructed tenants to pay them personally – and then kept the money.

231. The clearest evidence of this practice is documentary. A Super I and Regal lease signed on September 1, 2024 – one month before the Petition Date – lists Dass's personal Zelle payment information as the way for the tenant to pay rent. Dass wrote her own payment information into a corporate lease knowing Super I and Regal were about to file for bankruptcy and while both entities were already under citations to

discover assets.


LESSEE:
CHAMPION AUTOMOBILE
By ______
Alexis Lucena, Authorized Agent
By ______
Reuben Jesus Romo, Authorized Agent
By ______
Alexis Lucena, Individually
By ______
Reuben Jesus Romo, Individually

LESSOR:
SUPER I, LLC and REGAL, LLC
By ______, Agent
Suzie B Wilson, Authorized Agent



*Figure 1*: September 1, 2024, Super I and Regal lease showing Dass's Zelle information.

232. Indeed, the Sisters produced spreadsheets to their bankruptcy counsel acknowledging this practice. Part of that spreadsheet is reproduced below as Figure 2. The spreadsheets themselves are attached and incorporated into this Complaint as **Exhibit G**.

| Debtor Name | Tenant Address | Reason for Payment (e.g., rent, rent-to-own, sale, security deposit, etc.) | Payment Dat | Payment Amou | Payment Meth | Identify one: "Lana's Account," "Debtor's Account," "Title Company | Was it Transferred to Debtor Bank Accoun |
|---|---|---|---|---|---|---|---|
| BASS/ STTA | 6158 S ASHLAND | RENT | 5/6/2023 | $1,500.00 | CASH | CASH | NO |
| BASS/ STTA | 6158 S ASHLAND | RENT | 6/7/2023 | $1,500.00 | CASH | CASH | NO |
| BASS/ STTA | 6158 S ASHLAND | RENT | 7/10/2023 | $1,500.00 | CASH | CASH | NO |
| BASS/ STTA | 6158 S ASHLAND | RENT | 8/9/2023 | $1,500.00 | CASH | CASH | NO |
| BASS/ STTA | 6158 S ASHLAND | RENT | 9/12/2023 | $1,500.00 | CASH | CASH | NO |
| BASS/ STTA | 6158 S ASHLAND | RENT | 10/12/2023 | $1,500.00 | CASH | CASH | NO |
| BASS/ STTA | 6158 S ASHLAND | RENT | 11/15/2023 | $1,500.00 | CASH | CASH | NO |
| BASS/ STTA | 6158 S ASHLAND | RENT | 12/22/2023 | $1,500.00 | CASH | CASH | NO |
| BASS/ STTA | 6158 S ASHLAND | RENT | 1/25/2024 | $1,500.00 | CASH | CASH | NO |
| BASS/ STTA | 6158 S ASHLAND | RENT | 2/24/2024 | $1,500.00 | CASH | CASH | NO |
| BASS/ STTA | 6158 S ASHLAND | RENT | 3/20/2024 | $1,500.00 | CASH | CASH | NO |
| BASS/ STTA | 6158 S ASHLAND | RENT | 4/17/2024 | $1,500.00 | CASH | CASH | NO |
| BASS/ STTA | 6158 S ASHLAND | RENT | 5/15/2024 | $1,500.00 | CASH | CASH | NO |
| BASS/ STTA | 210 S CICERO | LAND CONTRACT MORTGAGE | 1/17/2022 | $1,100.00 | ZELLE | LANA'S ACCT AT CHASE 6315 | NO |
| BASS/ STTA | 210 S CICERO | LAND CONTRACT MORTGAGE | 2/14/2022 | $1,100.00 | ZELLE | LANA'S ACCT AT CHASE 6315 | NO |

*Figure 2*: Spreadsheet created by the Sisters and detailing rent payments they received and retained from B.A.S.S. & M.'s tenants.

233. The City has identified the following tenant payments diverted directly to the Sister's joint account also reflected in Exhibit F. Except where noted, the Sisters still retain these funds. On information and belief, additional Debtor tenants, additional

properties, and additional rent streams have been similarly diverted. The City reserved the right to amend to reflect additional diversions identified in discovery.

| Debtor | Property | Amount Collected by Sisters | Period |
|---|---|---|---|
| B.A.S.S. & M. | 6158 S. Ashland Ave. | $19,500 | 5/6/23 – 5/15/24 |
| B.A.S.S. & M. | 210 S. Cicero Ave. | $4,400 | 1/24/24 – 4/24/24 |
| B.A.S.S. & M. | 5236 S. Ashland Ave. | $225 | 6/2/24 |
| B.A.S.S. & M. | 5637-39 S. Ashland Ave. | $3,000 | 1/8/24 – 6/1/24 |
| B.A.S.S. & M. (post-petition) | 1127 W. 95th St. | $3,047 | 11/4/24 – 1/6/25 |
| Dagny | 432-436 N. Cicero Ave. | $6,300 | 1/28/22 – 10/3/22 |
| Dagny | 432-436 N. Cicero Ave. | $2,100 | 11/2/23 – 2/28/24 |
| Daisyland | 5919 S. Wentworth Ave. | $900 | 5/1/24 – 6/3/24 |
| Daisyland | 6118 S. Princeton Ave. | $4,950 | 1/22/22 – 9/21/22 |
| Daisyland | 6118 S. Princeton Ave. | $22,746.52 | 10/25/22 – 6/1/24 |
| Dover I | 227 S. Cicero Ave. | $2,000 | 6/10/24 – 7/10/24 |
| Regal | 4925 S. Halsted St. | $8,500 | 1/10/22 – 10/4/22 |
| Regal | 4925 S. Halsted St. | $21,800 | 11/7/22 – 6/2/24 |
| Regal | 8218 S. Ashland Ave. | $1,000 | 9/23/24 |
| Regal | 5637-39 S. Ashland Ave. | $3,150 | 1/21/22 – 9/21/22 |
| Regal | 5637-39 S. Ashland Ave. | $9,100 | 10/25/22 – 6/1/24 |
| Regal | 6933-37 S. Ashland Ave. | $6,600 | 11/1/23 – 9/9/24 |
| Super I | 719-25 N. Pulaski Rd. | $4,500 | 1/21/22 – 10/1/22 |
| Super I | 719-25 N. Pulaski Rd. | $9,000 | 10/28/22 – 4/2/24 |
| **Total:** | | **$132,819.52** | |

234. This practice extends beyond the Debtors. Tenants of Discount Inn likewise pay rent directly to the Sisters, bypassing corporate accounts entirely.

235. Beam of Canaan's rental income has been transferred to Wilson and SNS General.

236. On information and belief, additional rent streams from other Enterprise properties have been similarly diverted to the Sisters' personal accounts. The City

reserves the right to amend the totals in this Complaint to reflect additional diversions identified through discovery.

***6. The Sisters moved money freely among the Enterprise's entities whenever it suited them, without regard to which entity "owned" the funds.***

237. Beyond diverting money to themselves, the Sisters routinely moved funds directly among the Enterprise's entities without consideration and without regard to corporate separateness. The following transfers are representative of a much broader, continuous practice that would take a book worth of pages to fully detail.

| Date | From | To | Amount |
|---|---|---|---|
| 6/13/17 | Rovo | Random | $1,650 |
| 10/4/17 | Solo Land | Discount Inn | $2,000 |
| 10/4/17 | Comma | Discount Inn | $3,000 |
| 1/10/18 | Discount Inn | Dulce | $100 |
| 3/8/18 | Rovo | Random | $3,000 |
| 5/14/18 | Solo Land | Discount Inn | $3,000 |
| 5/22/18 | Discount Inn | Real Building | $70 |
| 9/17/18 | Random | Lot Acquisition | $1,000 |
| 10/1/18 | Solo Land | Discount Inn | $2,000 |
| 10/1/18 | Comma | Discount Inn | $3,000 |
| 10/18/18 | Solo Land | Vincennes | $2,000 |
| 10/23/18 | Comma | Vincennes | $3,000 |
| 11/19/18 | Solo Land | Discount Inn | $4,000 |
| 3/25/19 | Comma | Discount Inn | $4,000 |
| 3/25/19 | Solo Land | Discount Inn | $3,000 |
| 5/29/19 | Comma | Vincennes | $5,000 |
| 8/19/19 | Vincennes | Discount Inn | $2,500 |
| 9/18/19 | Solo Land | Discount Inn | $5,000 |
| 10/1/19 | Comma | Discount Inn | $2,000 |
| 10/23/19 | Random | Dass (personal account) | $500 |
| 11/7/19 | Random | SNS General | $8,000 |
| 12/2/19 | Solo Land | Discount Inn | $6,000 |
| 12/2/19 | Clark | Discount Inn | $2,000 |
| 12/2/19 | Vincennes | Discount Inn | $9,000 |

| Date | From | To | Amount |
|---|---|---|---|
| 12/30/19 | Vincennes | Discount Inn | $2,500 |
| 1/16/20 | Solo Land | Vincennes | $5,000 |
| 2/4/20 | Vincennes | Discount Inn | $2,000 |
| 5/8/20 | SNS General | Random | $12,000 |
| 9/22/20 | Vincennes | Discount Inn | $11,000 |
| 10/6/20 | Vincennes | Real Building | $100 |
| 10/6/20 | Vincennes | Lot Acquisition | $80 |
| 5/22/21 | Clark | Discount Inn | $8,000 |
| 10/1/21 | Solo Land | Discount Inn | $3,000 |
| 10/15/22 | Vincennes | Victorious | $80 |
| 9/19/2022 | 4311 West Palmer | Wilson (personal account) | $3,000 |
| 9/19/23 | Random | Dass (personal account) | $1,500 |
| 5/29/24 | 4311 West Palmer | Wilson (personal account) | $1,514.30 |
| 12/30/2024 | 4311 West Palmer | Wilson (personal account) | $3,000 |

238. The transfers set out above are representative examples only. The Sisters made numerous additional transfers of funds among the Enterprise's entities that are not itemized here, and the City reserves the right to amend to reflect additional transfers identified through discovery.

239. Again, many of these transfers were between entities that have no direct connection. There is no parent / subsidiary relationship between Clark and Discount Inn, or Vincennes and Discount Inn. This is because the Enterprise does not draw lines between entities. It is the Sisters.

7. ***The Sisters' own accountants moved income on paper between the entities to manage the Sisters' personal tax exposure.***

240. The Enterprise was not just a shield against creditors. The Sisters' own accountants at Shapiro & Olefsky treated the entire Enterprise as a single, fungible

pool of income and loss to be allocated wherever it minimized the Sisters' personal tax bill – further proof that the corporate separateness the Sisters now ask this Court to respect never existed in practice.

241. On September 14, 2024, Dass emailed Jamie Gabel, an accountant at Shapiro & Olefsky, asking: "Please let me know the tax ramification that Discount Inn Inc has on my personal tax liability with $257,308 in the total income reported on form 8879-COPR." The accountants' written response left nothing to interpretation: "None. Because it has suspended losses from prior years. ***That is why I moved income to Discount and lowered income on Random and Vincennes***." (emphasis added).

242. In other words, the Debtors' and Defendants' own accountants – professionals whose job it is to respect entity lines – openly moved reported income and losses among Discount Inn, Random, and Vincennes for no business reason at all, but solely to decrease Dass's personal tax liability.

243. These entities too have no parent / subsidiary relationship and thus have no legal basis to shift income and liabilities from one to the other. And certainly not for the express purpose of evading the payment of taxes for the owners.

244. Thus, even the professionals retained to observe the corporate formalities treated the three Parent Entities as interchangeable buckets for the Sisters' personal benefit.

245. This evidence matters beyond the alter ego and veil piercing analysis. It shows that the Sisters' transfers were not simply an effort to keep money away from the City and other creditors – they were part of a broader, likely unlawful practice of

shifting income and losses across entity lines to evade tax obligations as well, further confirming that adherence to the corporate fiction would sanction fraud not only against the Debtors' creditors but against the taxing authorities the Enterprise's own accountants were retained to serve.

***8. Even the Sisters Got Confused.***

246. Even the Sisters could not keep this web of entities straight.

247. By April 2024, STTA owned 5232 S. Ashland Avenue on paper—but the tenant there paid rent to B.A.S.S. & M., not STTA.

248. On June 6, 2020, the Sisters transferred a property from Regal to Real Soil, which sold it a few weeks later for $45,000, with no apparent business reason for the intermediate transfer.

249. Wilson has testified that S.T.E.P.A. has had no income and filed no tax return since 2015—even though S.T.E.P.A. sold property to a third party as recently as 2017, with the Sisters directing the proceeds away from S.T.E.P.A. entirely.

250. The Sisters misidentified the Debtor-owner of more than one hundred properties in the Debtors' own bankruptcy schedules.

## V. <u>COUNTS FOR RELIEF</u>

251. The City seeks relief in descending order of scope. Counts I through III ask the Court to disregard the separateness of the Enterprise as a whole. Counts IV through VIII seek avoidance of specific transfers. Counts IX seeks compensatory and punitive damages for the egregious breaches of fiduciary duty. Each Count is pled in the alternative to every other, pursuant to Fed. R. Civ. P. 8(d)(2) and (3), to the extent

the Court grants relief on a broader Count. Several Counts reach the same property or the same injury by different routes. The City seeks a single satisfaction and does not seek duplicative recovery on overlapping Counts.

**COUNT I**
**Alter Ego and Piercing the Corporate Veils**
*11 U.S.C. §§ 105, 541, 542, 544; Illinois common law — All Defendants*

252. Plaintiff realleges and incorporates all prior allegations of the Complaint.

253. Pursuant to the Standing Order, the Trustee has authorized the City to prosecute this claim on the Estates' behalf.

254. This Count is brought as an adversary proceeding to determine the validity, extent, and priority of interests in property and to obtain a related declaratory judgment, pursuant to Fed. R. Bankr. P. 7001(b) and (i) and 28 U.S.C. § 2201. An actual and justiciable controversy exists between the City and the Defendants concerning whether the Debtors and the Defendants are alter egos of one another, whether the Defendants are liable for the Debtors' obligations, and whether the property the Defendants hold is property of the Estates.

255. Under Illinois law, piercing the corporate veil is an equitable remedy. The City pleads this Count as a claim for declaratory and equitable relief and as a predicate to turnover of estate property and imposition of the Debtors' liability jointly and severally on all Defendants.

256. A claim to disregard the corporate form is property of the estate, and may be asserted by the trustee, where the injury alleged is general and common to all creditors rather than personal to any one of them. *Koch Refining v. Farmers Union Central*

*Exchange, Inc*., 831 F.2d 1339 (7th Cir. 1987).

257. The injury alleged here — the systematic extraction of the Debtors' assets, which reduced the pool available to every creditor of every Debtor and using the entire Enterprise as the instrumentality of the Sisters — is general to all creditors. No creditor holds a claim particular to itself arising from the conduct alleged.

258. Under Illinois common law, a court may disregard separate corporate existence where (1) there is such a unity of interest and ownership that the separate personalities of the entities and individuals no longer exist, and (2) adherence to the fiction of separate identities would sanction fraud, promote injustice, or result in inequitable circumstances.

259. In determining whether the unity-of-interest prong is met, Illinois courts examine, among other factors: inadequate capitalization; failure to issue stock; failure to observe corporate formalities; nonpayment of dividends; insolvency of the debtor corporation; nonfunctioning of other officers or directors; absence of corporate records; commingling of funds; diversion of assets from the corporation by or to a stockholder or other person or entity to the detriment of creditors; failure to maintain arm's-length relationships among related entities; and whether the corporation is in fact a mere facade for the operation of the dominant stockholders.

260. **Ownership of record is not required**. Equitable ownership, demonstrated by the control an individual exercises over the entity sought to be charged, satisfies the unity-of-interest and ownership element. That principle governs as to the Sisters. Wilson is the officer, director, or manager of record of every corporation

and manager entity named in this Complaint while holding record ownership of few of them. Dass was or is an owner, officer, member, manager of those entities and kept their books, to the extent they had them. The Sisters jointly exercised exclusive control over the entire Enterprise. Both testified at the 341 meeting of creditors for the Debtors as their representatives.

261. The alter ego doctrine permits a court to disregard nominally separate entities as a legal fiction and to treat them as one and the same. Where entities are alter egos, they are directly subject to each other's legal rights and obligations, the Defendants are jointly and severally liable for the Debtors' obligations, and the property nominally held by the Defendants is in substance the property of the Debtors and thus of the Estates under 11 U.S.C. § 541.

262. **Complete unity**. There is a complete unity of interest and ownership between the Debtors, the Sisters, and the other Defendants. Their separate personalities do not exist in substance. They operate as a single real estate enterprise controlled by the Sisters.

263. **Control**. The Sisters, whether directly or through the Defendants, are the only officers, directors, or managers who have ever actually controlled any of the Debtors and Defendants. They moved around properties, created subsidiaries, raiding the entities funds, used entity accounts to pay their personal expenses, and moved liabilities on their tax documents to evade paying those taxes. The Sisters exercised exclusive and absolute control over all entities in the Enterprise, including the Debtors and all non-Debtor Defendants.

264. **Inadequate capitalization**. The Debtors are inadequately capitalized, and the Defendants kept them that way by continually extracting their value, including through the direct account draws that repeatedly left transferring Debtors with less than $1,000 on hand. That was the entire point of the Enterprise: make the entities a collection proof shield protecting the Sisters from any liability.

265. **Failure to observe formalities and absence of records**. The Debtors and Defendants failed to observe corporate formalities at every level: they skipped basic formation requirements, ignored or never adopted operating agreements and bylaws, kept no meaningful corporate records, never documented the loans that supposedly moved between them, never held required meetings, and never maintained a real registered office or principal place of business.

266. **Insolvency**. The Debtors and all the entities within the Enterprise were insolvent and kept insolvent by design. The Sisters caused and continue to cause that insolvency by taking out profits while leaving all liability. Essentially the only way any entity within the Enterprise pays its bills is if the Sisters deem it acceptable to voluntarily put the Enterprise profits back into it to pay those expenses. They run the faucet and can turn on or off funds as they see fit for the entire Enterprise.

267. **Commingling and diversion**. The Debtors commingled property and funds with the Defendants and the entire Enterprise, diverted their own assets to the Defendants, and never maintained an arm's-length relationship with each other or with the Defendants. The Sisters cannot keep straight, from one filing to the next, which entity owns which asset.

268. **Third-party admission**. Wilson herself stated plainly that "Lana and I are the Debtors" meaning they are the Enterprise itself in correspondence to the Debtors' bankruptcy attorneys when demanding that those attorneys work for their interests personally, instead of the interests of the Debtors. The Debtors' own accountants also treated the Enterprise's income and losses as fungible across entity lines, moving reported income among Discount Inn, Random, and Vincennes to manage the Sisters' personal tax exposure, and not to reflect any real difference in which entity earned what. This is a third-party admission that the corporate separateness the Sisters now ask this Court to respect never existed in practice.

269. **Nominal ownership by family members**. The Sisters' use of their adult children's names on paper for NSW Assets, NSW Properties, Tax Property Investment Fund, and 10635 S Wentworth, combined with the Sisters' continued exclusive control of those entities' acquisitions, operations, and finances, parallels the fact pattern the Illinois Appellate Court found sufficient in *Dougherty*, 2017 IL App (1st) 161949, ¶¶ 7, 16–18. The check-memo evidence — notably "Loan from SBW to Nicole to LLC" — confirms that the Sisters, and not the nominal owners, at all times controlled the money moving into and out of those entities.

270. The Debtors are a mere facade through which the Sisters conduct their personal and business affairs interchangeably. The Sisters also used the Enterprise entities to pay for their personal expenses, such as for luxury vehicles, their American Express bills, and all kinds of other expense.

271. The unity-of-interest prong is satisfied.

272. Adherence to the fiction of separate identities would sanction fraud by allowing the Sisters to shield the assets their Enterprise generated from the reach of the Debtors' creditors — as they have already done through the transfers pled in other counts of this Complaint and through the conveyances described above.

273. Adherence to the fiction would also promote injustice and inequitable circumstances by allowing the Sisters to retain the substantial benefits of the Enterprise, including tens of millions of dollars in sale proceeds and rental income, while leaving the City and the Debtors' other creditors with nothing.

274. Both prongs are satisfied. The Defendants and the Debtors are alter egos of one another, and the Court should disregard their separate identities.

275. Because the Defendants and the Debtors are not separate in substance, the property nominally titled in the Non-Debtor Defendants is in substance the property of the Debtors. Each Non-Debtor Defendant has no existence, purpose, business, employees, offices, records, or decision-making independent of the Sisters, and every asset it holds was acquired with, or derived from, value generated by the Enterprise as a whole and moved among its entities without documentation, consideration, or regard to record title.

276. No innocent member, shareholder, partner, or beneficiary of any Non-Debtor Defendant would be prejudiced by the relief sought in this Count. Each Non-Debtor Defendant is owned and controlled exclusively by the Sisters or by persons acting at their direction, and the City is aware of no third party holding any interest in any of them.

277. No creditor of any Non-Debtor Defendant would be prejudiced by the relief sought in this Count. On information and belief, the Non-Debtor Defendants have no material creditors other than the City or creditors in the underlying bankruptcy case that would benefit from this ruling, and none extended credit in reliance on the separate identity of any Non-Debtor Defendant.

278. The Estates have no adequate remedy at law. A money judgment against the Non-Debtor Defendants would be uncollectible in the ordinary course, because those entities hold no assets independent of the property at issue, are administratively dissolved or subject to termination in several instances, and have demonstrated both the willingness and the capacity to convey property away on days' notice — including on April 8, 2026, two days after the City moved to compel.

279. Equity accordingly requires that the property held by the Non-Debtor Defendants be treated as property of the Estates, made available for ratable distribution to all creditors, and turned over under 11 U.S.C. § 542(a).

WHEREFORE, the City respectfully requests that the Court enter judgment in its favor and an order:

a. Declaring all Defendants and the Debtors to be alter egos of one another;
b. Disregarding the separate corporate existence of the Debtors and the Defendants and piercing the corporate veils of the Debtors;
c. Declaring that all Defendants are jointly and severally liable for the Debtors' obligations;
d. Declaring that the property held by or for the benefit of the Non-Debtor

Defendants, including the corpus of each Litigation-Timed Trustee Defendant, constitutes property of the Estates under 11 U.S.C. § 541;

e. Ordering turnover of that property to the Estates under 11 U.S.C. § 542(a), and imposing a constructive trust on it pending turnover;

f. Awarding costs; and

g. Granting all other relief this Court deems just and equitable.

**COUNT II**
**Substantive Consolidation of the Non-Debtor Defendants**
*11 U.S.C. §§ 541, 542, 105(a) — All Defendants*

280. Plaintiff realleges and incorporates all prior allegations of the Complaint.

281. Pursuant to the Standing Order, the Trustee has authorized the City to prosecute this claim on the Estates' behalf.

282. Under 11 U.S.C. § 541(a), property of the estate is defined in the broadest possible terms, which includes all equitable interests in property. Under § 542, the Court may then combine the assets of two or more entities with the estate into a common pool for all creditors, effectuating a substantive consolidation.. *See In re Cyberco Holdings, Inc.,* 431 B.R. 404 (Bankr. W.D. Mich., 2010); *see also, In re Clark Supply Co*., 172 F.2d 248 (7th Cir. 1949); *In re Todd Bldg. Corp*., 172 F.2d 254, 257 (7th Cir. 1949).

*283.* Under 11 U.S.C. § 105(a), the Court may issue any order necessary or appropriate to carry out the provisions of the Bankruptcy Code, including an order substantively consolidating estates and, in appropriate circumstances, the assets and liabilities of non-debtor affiliates with those estates. *See In re No Rust Rebar, Inc.,*

177 F.4th 1161 (11th Cir. 2026); *In re Auto-Train Corp.*, 810 F.2d 270 (D.C. Cir. 1987).

284. Substantive consolidation is warranted where either (1) the affairs of the entities are so entangled that separating them is prohibitively expensive or impossible and would harm all creditors, or where creditors dealt with the entities as a single economic unit and did not rely on their separate identities in extending credit; or (3) where the elements for alter ego / piercing the corporate veil exist.

285. Both circumstances exist here. The Enterprise kept no books capable of separating one entity from another. It documented no intercompany loans. It moved funds among entities without regard to which entity earned them, and its own accountants reported income across entity lines to manage the Sisters' personal tax exposure.

286. The entanglement is not incidental. It is the design of the Enterprise. Properties were assigned to entities according to whether they carried liability rather than according to any business purpose, and the resulting obligations were never respected as belonging to the entity that incurred them.

287. Reconstructing entity-by-entity accounts across three decades would consume estate resources disproportionate to any benefit and would prejudice all creditors, who would bear the cost of an exercise the Defendants' own recordkeeping made impossible.

288. No creditor extended credit in reliance on the separate identity of any Non-Debtor Defendant. The City's claims arise from Municipal Code violations at properties whose ownership the Enterprise shuffled among entities at will.

289. Consolidation would bring both the assets and the liabilities of the Non-Debtor Defendants into the Estates, and the City does not seek the benefit of the former without the burden of the latter.

290. The Enterprise also meets all the elements of alter ego or piercing the corporate veil as provided in Count I.

WHEREFORE, the City respectfully requests that the Court enter judgment in its favor and an order:

a. Substantively consolidating the assets and liabilities of the Non-Debtor Defendants with the Estates, effective as of the Petition Date or such other date as the Court determines;
b. Declaring that the assets of the Non-Debtor Defendants are property of the consolidated Estate under 11 U.S.C. § 541;
c. Ordering turnover of that property under 11 U.S.C. § 542(a); and
d. Granting all other relief this Court deems just and equitable.

**COUNT III**
**Substantive Consolidation of the Debtors' Estates**
*11 U.S.C. §§ 541, 542, 105(a) — All Defendants*

291. Plaintiff realleges and incorporates all prior allegations of the Complaint.

292. Pursuant to the Standing Order, the Trustee has authorized the City to prosecute this claim on the Estates' behalf.

293. This Count is pled in the alternative to Count II pursuant to Fed. R. Civ. P. 8(d)(2) and (3). An order granting this Count is not a denial of Count II, and the City seeks consolidation of the Debtors' estates whether or not the Court also consolidates

the Non-Debtor Defendants.

294. The twenty-one Debtors' cases are already jointly administered. Joint administration is a procedural convenience and does not merge the estates. Each Debtor's estate remains separate for purposes of asset ownership, claim allowance, and distribution.

295. The Debtors' affairs are entangled with one another to the same degree, and for the same reasons, as they are entangled with the Non-Debtor Defendants. They shared bank accounts and funds, moved money among themselves without documentation or consideration, and were operated interchangeably by the Sisters as a single economic unit.

296. Debtors MGIL and STTA never opened bank accounts. Whatever value they hold or held moved through accounts belonging to other Debtors or to the Defendants and cannot be attributed to either Debtor on any existing record.

297. The Debtors' properties were assigned among them according to which entity was to bear liability, not according to which entity earned or paid for the property, and the Enterprise disregarded those assignments in practice.

298. The Debtors' own accountants treated income and losses as fungible across entity lines and reported them accordingly.

299. Because the Debtors kept such poor records of inter-Debtor transfers, loans, and receivables, there is no way to obtain a full accounting or turnover between Debtors under 11 U.S.C. § 550. And the cost of completing any such accounting would fall on the Estates' creditors.

300. Consolidation of the Debtors' Estates would permit the orderly administration of claims and the ratable distribution of recoveries, and would prejudice no creditor, because no creditor extended credit to any Debtor in reliance on its separate identity or on any financial information distinguishing it from the others.

301. WHEREFORE, the City respectfully requests that the Court enter judgment in its favor and an order:

a. Substantively consolidating the estates of the twenty-one Debtors, effective as of the Petition Date or such other date as the Court determines;
b. Deeming the assets and liabilities of each Debtor to be the assets and liabilities of the consolidated Estate, and eliminating intercompany claims among the Debtors; and
c. Granting all other relief this Court deems just and equitable.

**COUNT IV**
**Avoidance of Transfers Under Illinois Law — Constructive Intent**
*IUFTA; 11 U.S.C. §§ 544 and 550 — All Defendants Receiving Transfers*

302. Plaintiff realleges and incorporates all prior allegations of the Complaint.

303. Pursuant to the Standing Order, the Trustee has authorized the City to prosecute this claim on the Estates' behalf.

304. Pursuant to 11 U.S.C. § 544(b)(1), "the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim..."

305. Under Illinois law, a creditor may avoid a transfer if (1) the creditor's claim arose before the transfer, (2) the debtor did not receive reasonably equivalent value

in exchange for the transfer, and (3) the debtor was insolvent at that time or became insolvent as a result of the transfer. 740 ILCS 160/6, 160/8.

306. Pursuant to 11 U.S.C. § 550(a), to the extent a transfer is avoided under section 544, the trustee may recover the transferred property, or the value of the transferred property, from (1) the initial transferee of the transfer, or the entity for whose benefit the transfer was made; or (2) any immediate or mediate transferee of the initial transferee.

307. Since October 16, 2017, Wilson and Dass personally caused the Debtors to transfer:

a. $442,536.00 to Discount Inn;
b. $432,817.22 to Dass;
c. $90,000 to Wilson;
d. $294,871.52 to Wilson and Dass's joint account;
e. $45,000 to Ashoor Baba
f. $172,525 to Random;
g. $550 to Rovo;
h. $92,620 to SNS General; and
i. $44,000 to Vincennes.

308. All these transfers occurred without the Debtors receiving reasonably equivalent value in return.

309. The claims of creditors, including the City's, arose before the transfers.

310. Creditors' claims, including the City's, arose before the transfers.

311. The Debtors were insolvent at the time of the transfers or became insolvent as a result of the transfers.

312. The Debtors were insolvent because the sum of their debts exceeded their assets at fair valuation.

313. The Debtors were insolvent because they were generally not paying their debts as they became due.

314. The Sisters were the initial transferees or entities for whose benefit the transfers were made.

315. As a result of the transfers, the Debtors' creditors were injured.

316. At all relevant times, the City held an unsecured claim and could avoid the transfers under Illinois law and therefore qualifies as a triggering creditor under 11 U.S.C. § 544(b)(1).

317. The transfers are voidable under Illinois law and § 544(b)(1) of the Code.

318. The trustee is entitled to recover the transferred property, or the value of the transferred property, from the Defendants.

WHEREFORE, the City respectfully requests that the Court enter judgment in its favor and an order:

a. Determining that the transfers are avoidable transfers under 740 ILCS 160/6;

b. Determining that the transfers are avoidable transfers under 11 U.S.C. § 544(b)(1);

c. Entering judgment against Discount Inn, Wilson, and Dass, jointly and

severally, in the amount of at least $442,536, representing the value of the transfers to Discount Inn, and in favor of the Estates under 11 U.S.C. § 550;

d. Entering judgment against Wilson and Dass, jointly and severally, in the amount of at least $432,817.22, representing the value of the transfers to Dass, and in favor of the Estates under 11 U.S.C. § 550;

e. Entering judgment against Wilson and Dass, jointly and severally, in the amount of at least $90,000, representing the value of the transfers to Wilson, and in favor of the Estates under 11 U.S.C. § 550;

f. Entering judgment against Wilson and Dass, jointly and severally, in the amount of at least $294,871.52, representing the value of the transfers to Wilson and Dass's joint account, and in favor of the Estates under 11 U.S.C. § 550;

g. Entering judgment against Wilson and Dass, jointly and severally, in the amount of at least $45,000, representing the value of the transfers to Ashoor Baba, and in favor of the Estates under 11 U.S.C. § 550;

h. Entering judgment against Random, Wilson, and Dass, jointly and severally, in the amount of at least $172,525, representing the value of the transfers to Random, and in favor of the Estates under 11 U.S.C. § 550;

i. Entering judgment against Rovo, Wilson, and Dass, jointly and severally, in the amount of at least $550, representing the value of the transfers to Rovo, and in favor of the Estates under 11 U.S.C. § 550;

j. Entering judgment against SNS General, Wilson, and Dass, jointly and severally, in the amount of at least $92,620, representing the value of the transfers to SNS General, and in favor of the Estates under 11 U.S.C. § 550;

k. Entering judgment against Vincennes, Wilson, and Dass, jointly and severally, in the amount of at least $44,000, representing the value of the transfers to Vincennes, and in favor of the Estates under 11 U.S.C. § 550; and

l. Granting all other relief this Court deems just and equitable.

**COUNT V**
**Avoidance of Transfers Under Illinois Law — Actual Intent**
*IUFTA; 11 U.S.C. §§ 544 and 550 — All Defendants Receiving Transfers*

319. Plaintiff realleges and incorporates all prior allegations of the Complaint.

320. Pursuant to the Standing Order, the Trustee has authorized the City to prosecute this claim on the Estates' behalf.

321. Under Illinois law, a creditor may avoid a transfer made with actual intent to hinder, delay, or defraud a creditor of the debtor. Illinois law provides non-exhaustive factors bearing on actual intent. 740 ILCS 160/5(b).

322. Pursuant to 11 U.S.C. § 544(b)(1), "the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim..."

323. Under Illinois law, a creditor may avoid a transfer if the debtor made the transfer with actual intent to hinder, delay, or defraud a creditor of the debtor. 740

ILCS 160/5(a)(1), 160/8.

324. Pursuant to 11 U.S.C. § 550(a), to the extent a transfer is avoided under § 544, the trustee may recover the property transferred or the value of the transferred property, from (1) the initial transferee of the transfer, or the entity for whose benefit such transfer was made; or (2) any immediate or mediate transferee of the initial transferee.

325. Illinois law provides non-exhaustive factors for courts to consider when determining actual intent to hinder, delay, or defraud. 740 ILCS 160/5(b).

326. Each applies here:

327. **Transfers to insiders**. Every transfer identified below moved money or property from a Debtor to Wilson, Dass, or an entity Wilson and Dass owned and controlled—their own insiders by definition.

328. **The Debtors retained control after the transfer**. The Sisters controlled the transferred funds and property both before and after each transfer, because the Sisters controlled every entity on both sides of every transaction.

329. **The transfers were concealed**. The Sisters concealed the transfers from creditors in concrete, dated ways: by moving assets into newly formed entities and land trusts within one to two days of specific enforcement events; by never opening bank accounts for MGIL or STTA, leaving no transactional record for creditors to trace; by directing tenants to pay rent to Dass's personal Zelle account rather than to the record owner; and by never documenting the purported "loans" that moved money among the Enterprise.

330. **The Debtors had been sued or threatened with suit**. The City had sued, was suing, and was enforcing judgments against the Debtors throughout the period these transfers occurred, including through active citations to discover assets by early 2024.

331. **The transfers involved substantially all of the Debtors' assets**. The transfers identified below and throughout this Complaint constituted substantially all of the affected Debtors' valuable and liquid assets, often leaving the transferring Debtor with less than $1,000 in its account.

332. **The Debtors became difficult to locate or reach**. Rather than "absconding" in the sense of fleeing, the Debtors and Defendants made themselves difficult for creditors to locate or reach: nearly all of them share a single UPS mailbox as their only registered office, Wilson listed her deceased husband as a registered agent for years after his death, and Wilson has since relocated to a Florida property purchased for $950,000 in cash – a state with a notably protective homestead exemption.

333. **The Debtors removed or concealed assets**. The Sisters removed and concealed assets by quit-claiming valuable properties into newly formed land trusts within days of the City's discovery efforts, as detailed in the timeline.

334. **The Debtors did not receive reasonably equivalent value**. None of the transfers identified above involved any consideration to the transferring Debtor.

335. **The Debtors were insolvent or become insolvent.** The Debtors were insolvent because their debts exceeded their assets at fair valuation, and because they were not generally paying their debts as they came due. *See* Dkt. No. 400-1.

336. **The transfers occurred when substantial debt was incurred**. As described above, transfers repeatedly followed shortly after the Debtors incurred specific tax, ticket, and judgment liabilities to the City.

337. Since October 16, 2017, Wilson and Dass personally caused the Debtors to transfer:

a. $442,536.00 to Discount Inn;

b. $432,817.22 to Dass;

c. $90,000 to Wilson;

d. $294,871.52 to Wilson and Dass's joint account;

e. $45,000 to Ashoor Baba;

f. $172,525 to Random;

g. $550 to Rovo;

h. $92,620 to SNS General; and

i. $44,000 to Vincennes.

338. These transfers occurred without the Debtors' receiving reasonably equivalent value in return for the transfers.

339. The Debtors, through Wilson, Dass, and the other Defendants, made the transfers with actual intent to hinder, delay, or defraud creditors.

340. Wilson and Dass were the initial transferees or entities for whose benefit the transfers were made.

341. As a result of the transfers, the Debtors' creditors were injured.

342. At all relevant times, the City held an unsecured claim and could avoid the

transfers under Illinois law and therefore qualifies as a triggering creditor under 11 U.S.C. § 544(b)(1).

343. The transfers are voidable under Illinois law and § 544(b)(1) of the Code.

344. The Trustee is entitled to recover the transferred property or the value of the transferred property from the Defendants.

WHEREFORE, the City respectfully requests that the Court enter judgment in its favor and an order:

a. Determining that the transfers are avoidable transfers under 740 ILCS 160/5(a)(1);

b. Determining that the transfers are avoidable transfers under 11 U.S.C. § 544;

c. Entering judgment against Discount Inn, Wilson, and Dass, jointly and severally, in the amount of at least $442,536, representing the value of the transfers to Discount Inn, and in favor of the Estates under 11 U.S.C. § 550;

d. Entering judgment against Wilson and Dass, jointly and severally, in the amount of at least $432,817.22, representing the value of the transfers to Dass, and in favor of the Estates under 11 U.S.C. § 550;

e. Entering judgment against Wilson and Dass, jointly and severally, in the amount of at least $294,871.52, representing the value of the transfers to Wilson and Dass's joint account, and in favor of the Estates under 11 U.S.C. § 550;

f. Entering judgment against Wilson and Dass, jointly and severally, in the amount of at least $90,000, representing the value of the transfers to Wilson, and in favor of the Estates under 11 U.S.C. § 550;

g. Entering judgment against Wilson and Dass, jointly and severally, in the amount of at least $45,000, representing the value of the transfers to Ashoor Baba, and in favor of the Estates under 11 U.S.C. § 550;

h. Entering judgment against Random, Wilson, and Dass, jointly and severally, in the amount of at least $172,525, representing the value of the transfers to Random, and in favor of the Estates under 11 U.S.C. § 550;

i. Entering judgment against Rovo, Wilson, and Dass, jointly and severally, in the amount of at least $550, representing the value of the transfers to Rovo, and in favor of the Estates under 11 U.S.C. § 550;

j. Entering judgment against SNS General, Wilson, and Dass, jointly and severally, in the amount of at least $92,620, representing the value of the transfers to SNS General, and in favor of the Estates under 11 U.S.C. § 550;

k. Entering judgment against Vincennes, Wilson, and Dass, jointly and severally, in the amount of at least $44,000, representing the value of the transfers to Vincennes, and in favor of the Estates under 11 U.S.C. § 550; and

l. Granting all other relief this Court deems just and equitable.

## COUNT VI
### Avoidance of Transfers — Constructive Intent
*11 U.S.C. §§ 548(a)(1)(B) and 550 — All Defendants Receiving Transfers*

345. Plaintiff realleges and incorporates all prior allegations of the Complaint.

346. Pursuant to the Standing Order, the Trustee has authorized the City to prosecute this claim on the Estates' behalf.

347. Pursuant to 11 U.S.C. § 548(a)(1)(B), "[t]he trustee may avoid any transfer…of an interest of the debtor in property…that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily" (1) "received less than a reasonably equivalent value in exchange for such transfer or obligation" and (2) "was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation."

348. Pursuant to 11 U.S.C. § 550(a), to the extent a transfer is avoided under section 548, the trustee may recover the property transferred, or the value the transferred property, from (1) the initial transferee of the transfer, or the entity for whose benefit the transfer was made; or (2) any immediate or mediate transferee of the initial transferee.

349. Since October 16, 2022, the Sisters personally caused the Debtors to transfer:

a. $35,157.22 to Dass;

b. $114,221.52 to Wilson and Dass's joint account;

c. $152,351 to Discount Inn;

d. $12,700 to Random;

e. $550 to Rovo; and

f. $18,100 to SNS General. The Debtors did not receive reasonably equivalent value in exchange for the transfers.

350. The Debtors were insolvent at the time of the transfers or became insolvent as a result of the transfers.

351. The Debtors were insolvent because the sum of their debts exceeded their assets at fair valuation.

352. The Debtors were insolvent because they were generally not paying their debts as they became due.

353. Wilson and Dass were the initial transferees or entities for whose benefit the transfers were made.

354. As a result of the transfers, the Debtors' creditors were injured.

355. The transfers are voidable under § 548(a)(1)(B) of the Code.

356. The Trustee is entitled to recover the transferred property or the value of the transferred property from the Defendants.

WHEREFORE, the City respectfully requests that the Court enter judgment in its favor and an order:

a. Determining that the transfers are avoidable transfers under 11 U.S.C. § 548(a)(1)(B);

b. Entering judgment against Wilson and Dass, jointly and severally, in the amount of at least $35,157.22, representing the value of the transfers to Dass, and in favor of the Estates under 11 U.S.C. § 550;

c. Entering judgment against Wilson and Dass, jointly and severally, in the amount of at least $114,221.52, representing the value of the transfers to Wilson and Dass's joint account, and in favor of the Estates under 11 U.S.C. § 550;

d. Entering judgment against Discount Inn, Wilson, and Dass, jointly and severally, in the amount of at least $152,351, representing the value of the transfers to Discount Inn, and in favor of the Estates under 11 U.S.C. § 550;

e. Entering judgment against Random, Wilson, and Dass, jointly and severally, in the amount of at least $12,700, representing the value of the transfers to Random, and in favor of the Estates under 11 U.S.C. § 550;

f. Entering judgment against Rovo, Wilson, and Dass, jointly and severally, in the amount of at least $550, representing the value of the transfers to Rovo, and in favor of the Estates under 11 U.S.C. § 550;

g. Entering judgment against SNS General, Wilson, and Dass, jointly and severally, in the amount of at least $18,100, representing the value of the transfers to SNS General, and in favor of the Estates under 11 U.S.C. § 550; and

h. Granting all other relief this Court deems just and equitable.

**COUNT VII**
**Avoidance of Transfers — Actual Intent**
*11 U.S.C. §§ 548(a)(1)(A) and 550 — All Defendants Receiving Transfers*

357. Plaintiff realleges and incorporates all prior allegations of the Complaint.

358. Pursuant to the Standing Order, the Trustee has authorized the City to prosecute this claim on the Estates' behalf.

359. Under 11 U.S.C. § 548(a)(1)(A), the trustee may avoid any transfer of an interest of the debtor in property made within two years before the petition date if the debtor made the transfer with actual intent to hinder, delay, or defraud any entity to which the debtor was or became indebted.

360. Because direct evidence of fraudulent intent is uncommon, courts consider badges of fraud as circumstantial evidence of actual intent, including: whether the debtor retained possession or control of the property after the transfer; whether the transferee shared a familial or other close relationship with the debtor; whether the debtor received consideration; whether the transfer was disclosed or concealed; whether the transfer followed suit or the threat of suit; whether the transfer involved substantially all of the debtor's assets; whether the debtor absconded; and whether the debtor was or became insolvent.

361. Every badge is established here, on the facts pled in Count V above, which are incorporated by reference.

362. Since October 16, 2022, Wilson and Dass personally caused the Debtors to transfer:

a. $35,157.22 to Dass;

b. $114,221.52 to Wilson and Dass's joint account;

c. $152,351 to Discount Inn;

d. $12,700 to Random;

e. $550 to Rovo; and

f. $18,100 to SNS General.

363. The Debtors, through Wilson, Dass, and the other Defendants, made the transfers with actual intent to hinder, delay, or defraud their creditors.

364. Wilson and Dass were the initial transferees or entities for whose benefit the transfers were made.

365. As a result of the transfers, the Debtors' creditors were injured.

366. The transfers are voidable under § 548(a)(1)(A) of the Code.

367. The Trustee is entitled to recover the transferred property or the value of the transferred property from the Defendants.

WHEREFORE, the City respectfully requests that the Court enter judgment in its favor and an order:

a. Determining that the transfers are avoidable transfers under 11 U.S.C. § 548(a)(1)(A);

b. Entering judgment against Wilson and Dass, jointly and severally, in the amount of at least $35,157.22, representing the value of the transfers to Dass, and in favor of the Estates under 11 U.S.C. § 550;

c. Entering judgment against Wilson and Dass, jointly and severally, in the amount of at least $114,221.52, representing the value of the transfers to Wilson and Dass's joint account, and in favor of the Estates under 11 U.S.C. § 550;

d. Entering judgment against Discount Inn, Wilson, and Dass, jointly and

severally, in the amount of at least $152,351, representing the value of the transfers to Discount Inn, and in favor of the Estates under 11 U.S.C. § 550;

e. Entering judgment against Random, Wilson, and Dass, jointly and severally, in the amount of at least $12,700, representing the value of the transfers to Random, and in favor of the Estates under 11 U.S.C. § 550;

f. Entering judgment against Rovo, Wilson, and Dass, jointly and severally, in the amount of at least $550, representing the value of the transfers to Rovo, and in favor of the Estates under 11 U.S.C. § 550;

g. Entering judgment against SNS General, Wilson, and Dass, jointly and severally, in the amount of at least $18,100, representing the value of the transfers to SNS General, and in favor of the Estates under 11 U.S.C. § 550; and

h. Granting all other relief this Court deems just and equitable.

## COUNT VIII
## Avoidance of Post-Petition Transfers
*11 U.S.C. §§ 549 and 550 — All Defendants Receiving Transfers*

368. Plaintiff realleges and incorporates all prior allegations of the Complaint.

369. Pursuant to the Standing Order, the Trustee has authorized the City to prosecute this claim on the Estates' behalf.

370. Pursuant to 11 U.S.C. § 549(a), "[t]he trustee may avoid a transfer of property of the estate…that occurs after the commencement of the case."

371. Pursuant to 11 U.S.C. § 550(a), to the extent a transfer is avoided under

section 549, the trustee may recover the property transferred, or the value of such property, from (1) the initial transferee of the transfer, or the entity for whose benefit the transfer was made; or (2) any immediate or mediate transferee of the initial transferee.

372. The Sisters collected $3,047 in post-petition rent from B.A.S.S. & M.'s tenant at 1127 W. 95th St. between November 4, 2024, and January 6, 2025 – after the Debtors' bankruptcy cases commenced on the Petition Date.

373. This transfer of estate property was not authorized by the Bankruptcy Code or by the Court.

374. The Debtors' creditors were injured as a result.

375. On information and belief, additional post-petition rent collections and transfers exist that the City has not yet been able to identify or trace; the City reserves the right to amend to reflect additional post-petition transfers identified through discovery.

376. The post-petition transfers are voidable under § 549 of the Code. Therefore, the trustee is entitled to recover those funds or the value or those funds from Wilson and Dass.

WHEREFORE, the City respectfully requests that the Court enter judgment in its favor and an order:

a. Determining that the post-petition transfers are avoidable transfers under 11 U.S.C. § 549;

b. Entering judgment against Wilson and Dass, jointly and severally, in the

amount of the value of the transfers, at least $3,047, and in favor of the Estates under 11 U.S.C. § 550; and

c. Granting all other relief this Court deems just and equitable.

**COUNT IX**
**Breach of Fiduciary Duty**
*Illinois common law, 11 U.S.C. §§ 541 and 544 — Wilson and Dass*

377. Plaintiff realleges and incorporates all prior allegations of the Complaint.

378. Pursuant to 11 U.S.C. §§ 541 and 544, the Trustee, and now the City, has the authority to bring breach of fiduciary duty claims on behalf of the estate as a whole or on behalf of creditors.

379. Upon the insolvency of the Debtors, their assets constituted a trust fund for the benefit of their creditors, including the City, and Wilson and Dass, as the controlling members and managers of the insolvent Debtors owed fiduciary duties to those creditors with respect to the disposition of the Debtors' assets.

380. Wilson and Dass breached those fiduciary duties by diverting the Debtors' assets away from creditors and to, or for the benefit of, themselves, in furtherance of the scheme to defeat creditors' claims.

381. This injured all creditors and the Debtors because the diversion of funds did not pay down claims or liens, leaving less money available to pay creditors and leaving the overall debt extremely high.

382. Wilson and Dass's breaches were knowing, willful, and in bad faith.

383. As a direct and proximate result of Wilson and Dass's breaches, creditors were deprived of the funds to which they were entitled and have been damaged in the

amount of the transferred proceeds, plus interest.

WHEREFORE, the City respectfully requests that the Court enter judgment in its favor and against Wilson and Dass, jointly and severally, and award:

a. Compensatory damages in the amount of the diverted proceeds in an amount not less than $1,773,779.74;

b. Punitive damages in an amount sufficient to punish and deter Wilson and Dass's willful misconduct in an amount of treble the compensatory damages, *i.e.*, $5,321,339.22;

c. Costs; and

d. Such other and further relief as this Court deems just.

Dated: August 20, 2026

Respectfully submitted,

**CITY OF CHICAGO,** derivatively for the bankruptcy estates of the jointly administered Debtors,

Corporation Counsel
Mary B. Richardson-Lowry

By: /s/ Elizabeth Conard
Assistant Corporation Counsel

David Paul Holtkamp, Deputy Corporation Counsel
Peter Cavanaugh, Chief Assistant Corporation Counsel
Elizabeth Conard, Assistant Corporation Counsel
City of Chicago Department of Law
121 N. La Salle St., Suite 400
Chicago, Illinois 60602
312-744-6967
David.holtkamp2@cityofchicago.org
Peter.cavanaugh@cityofchicago.org
Elizabeth.conard@cityofchicago.org